# STATE OF CONNECTICUT *v.* CRAIG DAVIS
## (AC 33012)

Lavine, Sheldon and West, Js.

Argued January 5—officially released May 15, 2012

*William B. Westcott,* for the appellant (defendant).

*James M. Ralls,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Gary Nicholson,* senior assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Craig Davis, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (3) and robbery in the first degree in violation of § 53a-134 (a) (3). On appeal, the defendant claims that the court improperly denied his motion for a thirty day continuance to permit him to conduct further DNA testing after the state expressed its intention to present at trial the newly enhanced audio portion of a video-taped interview with the defendant. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, Matthew Barrett, was beaten and stabbed to death on the morning of May 5, 2005, at his business, Best Buy Auto, in New Haven. At approximately 7:30 a.m. that morning, Kraushon Clark, who

had been doing carpentry work for the victim, arrived at Best Buy Auto and discovered the victim lying face-down in the garage surrounded by blood. Upon noticing the victim's body, Clark was nearly struck in the face with a large object by an individual inside the garage bay. The same individual attempted to grab Clark's jacket when Clark turned to run out of the building.[1] After running out of the garage, Clark saw two black males run out of the garage and hop over a fence of an adjacent house. Clark then entered his car and attempted to chase down the fleeing men. When Clark spotted one of the two men talking on a cell phone near a diner on Forbes Avenue, that same man jumped over another fence and continued to flee. Clark then called the police to report the crime. Around the same time, two women who were exiting a gas station on Forbes Avenue had to stop their car abruptly when a Saturn automobile screeched to a stop in front of them. A black man matching the defendant's description ran over to the car and got into the passenger seat and the automobile quickly sped off. The car was later identified as one owned by the codefendant, Tyehimba Adeyemi. Clark later identified the defendant from a photographic array as the man he had seen talking on a cell phone near the Forbes Avenue diner.

Records from Best Buy Auto indicated that the victim had sold the Saturn to Adeyemi two months prior to the victim's murder. There were numerous telephone calls exchanged between Adeyemi's cell phone and the defendant's cell phone in the days before the murder. Adeyemi made a call to the defendant in the hour before the victim's murder and another call at 7:58 a.m., following the murder. Later that same day, Adeyemi made

---

[1] New Haven police Officer Andrew Gambardella testified that Clark identified the man who swung the object at him inside Best Buy Auto as a tall black man wearing a dark hooded sweatshirt or "hoodie." During Clark's testimony, he stated that he could not identify the man who swung the object at him.

calls to the defendant from the New York City area and from Virginia. In the following days, Adeyemi made more calls to the defendant from other southern states.

At Best Buy Auto, police discovered evidence of a struggle in the customer waiting area of the garage. In the first garage bay, police discovered the victim's body lying on the floor surrounded by a large pool of blood. Inside the garage bay, blood was found on a fire extinguisher, a shovel, a folding knife, a broom, a box cutter knife, a pair of sunglasses and a metal door handle. Additionally, blood-like stains appeared on the victim's torn jacket, vehicles parked inside the garage, the floor of the garage including a bloody footprint, a microwave oven and the inside of the closed garage door. DNA testing indicated that the victim's DNA was consistent with the DNA found on the fire extinguisher, the shovel, the folding knife, the pair of sunglasses, the broom and on the metal door handle.[2] DNA testing also indicated that the defendant's DNA was consistent with the DNA found on the box cutter knife. Finally, DNA testing indicated that Adeyemi's DNA was consistent with DNA contained on the victim's bloodstained cell phone and cell phone holder recovered outside the garage.

On May 27, 2005, the defendant gave a voluntary interview to the police in which he stated that he was acquainted with Adeyemi and that they had engaged in drug use together. The defendant stated in this interview that he had been at home on the morning of the victim's murder, but he admitted that he had spoken by phone with Adeyemi on that day. The defendant also stated in the interview that the only time he had been

---

[2] The forensic science examiner who conducted the DNA testing in this case testified that, generally, forensic examiners do not indicate that any individual is a *source* of any DNA sample tested, but rather conclude that the results are *consistent with that person being the source of or a contributor* to that DNA sample. Such testimony is frequently accompanied by a statistical calculation as to the probability that the tested person is in the sample.

to Best Buy Auto was with Adeyemi, when Adeyemi purchased his Saturn automobile from the victim.[3] Despite denying any involvement in the murder, the defendant was arrested on June 29, 2005, and subsequently charged with felony murder in violation of § 53a-54c, conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134 (a) (3) and robbery in the first degree in violation of § 53a-134 (a) (3). During a second interview with police, on the day of his arrest, the defendant again denied being present at Best Buy Auto on the date of the crime. In that interview, he again claimed that he had been at home on the morning of the victim's murder and stated that he had been with Adeyemi at Best Buy Auto on a prior occasion. The defendant further stated that Adeyemi had a dispute with the victim and that the victim allegedly owed Adeyemi money.

On March 16, 2006, during a three hour interview preceding his polygraph examination by the state police, the defendant provided a new and different account of his whereabouts on the morning of the victim's murder, admitting for the first time that he indeed had been present at the crime scene around the time of the victim's murder.[4] The defendant stated that on that morning, Adeyemi had picked him up and driven

---

[3] The defendant did not state how long it had been since he had accompanied Adeyemi to Best Buy Auto. Evidence from the Best Buy Auto records showed that Adeyemi purchased his Saturn there on March 5, 2005, which was two months before the victim's murder.

[4] Defense counsel Thomas Ullman told the court that the defendant agreed to submit to a state police polygraph examination. Both of the defendant's counsel accompanied the defendant to the polygraph examination but were not present during the examination. Ullman indicated that the defendant signed a waiver form for the polygraph examination. The waiver is not in the record in this case. The defendant filed a motion in limine to exclude the statements he provided on March 16, 2006, to the state police and New Haven police. The defendant sought to exclude the statements on the ground that they were disclosed after jury selection began, not on any improper waiver grounds.

him to Best Buy Auto. When they arrived at Best Buy Auto, the victim had not yet arrived at work, so they went to a local diner for coffee. When they returned to Best Buy Auto, Adeyemi went inside and the defendant stayed in the car. The defendant stated that he became impatient waiting in the car, and so he went inside. Upon entering the garage, the defendant stated that he found the victim on the floor of the garage bleeding and Adeyemi holding a shovel. When Clark entered the garage bay, the defendant saw Adeyemi swing the shovel at him. The defendant stated that he then ran out of the garage, followed by Clark, who later spotted him in front of the Forbes Avenue diner, prompting him to continue fleeing from the area. The defendant's statements during the interview preceding his polygraph examination were videotaped—a fact noted in a report by New Haven police Detective Martin Dadio.

The following procedural history is relevant to the disposition of the defendant's claim. On September 3, 2008, the court began jury selection in the defendant's trial. On September 24, 2008, thirteen days into jury selection, the state indicated that an audio recording of the prepolygraph interview, which had previously been inaudible, had been enhanced and made audible. Given the state's intention to put the enhanced recording in evidence at trial, the defendant, on September 29, 2008, filed a motion for a continuance to delay the start of trial until October 30, 2008. In his motion, the defendant argued that, in light of the contents of the enhanced recording, his trial strategy would necessarily have to change from one in which the defendant had no involvement in the crime whatsoever to one in which he was merely present at the crime scene, but not a participant in the crime. As a result of this change in strategy, the defendant argued that he had a compelling need to test the twenty-one previously untested DNA swabs taken from the crime scene. Defense counsel,

after consulting with the state forensic science laboratory (state laboratory), represented to the court that testing of the swabs "would take approximately a month." The state did not take a position on the defendant's motion.

The court denied the defendant's motion for a continuance on September 30, 2008. Among its reasons for the denial, the court first noted that requests for continuances on the eve of trial are "frowned upon." The court noted that the motion had been made during the jury selection process after thirteen jurors had already been selected. The court had contacted all previously selected jurors to ask them whether they could serve if the trial started one month later. Three jurors replied that they could not participate in the trial if it was delayed one month and four had not returned the clerk's telephone call. The court also noted that the swabs had been available to both sides for testing for the past "two or three years." In addition, the court observed that further DNA tests might or might not be helpful to the defense but could not completely exonerate him because previous DNA testing of other samples had revealed the presence of his DNA at the crime scene. For these reasons, the court rejected the defendant's claim that denial of the motion for a continuance would interfere with his right to present a defense or his right to a fair trial. Although it denied the defendant's motion to continue the start of trial for thirty days, the court stated that it was amenable to revisiting the need for a continuance at a future point if there was reason to do so. The defendant proceeded to have the twenty-one swabs sent to the state laboratory for DNA testing and the court ordered that such testing be expedited.

On October 7, 2008, the defendant filed a motion in limine seeking sanctions for the late disclosure of the defendant's March 16, 2006 videotaped polygraph interview with state police. In his motion, the defendant

argued that the statements he made during the interview should be excluded because they were prejudicial and that the state should not benefit from their late disclosure. The court noted that while neither the prosecutor nor defense counsel was aware of the defendant's inculpatory statements until an enhanced version of the tape was made available on September 24, 2008, the tape had been recorded nearly two and one-half years earlier. The court thus denied the defendant's motion in limine, concluding that the enhanced tape's disclosure was not in fact late.

On Thursday, October 9, 2008, outside the presence of the jury, the state informed the defendant that it had received a preliminary oral report from the state laboratory that the defendant's DNA was consistent with him being a contributor to the DNA sample on one of the newly tested swabs from the crime scene. On Friday, October 10, 2008, the state relayed this information to the court and stated that a written report was expected by Wednesday or Thursday of the following week. The same day, the state rested its case-in-chief and the defendant also rested without calling any witnesses. On Tuesday, October 14, 2008, following closing arguments by both parties, the state received a copy of the written report of the DNA testing sent by the state laboratory. The test results, which were the same as those reported in the preliminary oral report from the week before, were that the defendant's DNA was consistent with him being a contributor to the mixture of DNA found on the garage door and that the victim could not be eliminated as a minor contributor to the mixture.

After receiving the written report, the state did not move to reopen the evidence. Defense counsel ultimately refused to take a position on whether to move to reopen the evidence to introduce the new DNA tests. The court subsequently charged the jury. The defendant

was convicted of all charges. On December 12, 2008 the court denied the defendant's motion for a new trial and imposed a total effective sentence of fifty-five years incarceration. This appeal followed.

On appeal, the defendant claims that the court violated his constitutional rights by improperly denying his motion for a continuance in order to test DNA samples of previously untested swabs from the crime scene. We disagree.

"The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . .

"A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, *particularly in the reasons presented to the trial judge at the time the request is denied.*" (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Hamilton*, 228 Conn. 234, 239–40, 636 A.2d 760 (1994). "In the event that the trial court acted unreasonably in denying a continuance, the reviewing court must also engage in harmless error analysis." Id., 242.

Among the factors that may enter into the court's exercise of discretion in considering a request for a continuance are "the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants,

witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing of the request; [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . ." Id., 240. "We are especially hesitant to find an abuse of discretion where the court has denied a motion for continuance made on the day of the trial." (Internal quotation marks omitted.) *State* v. *Calderon*, 82 Conn. App. 315, 320, 844 A.2d 866, cert. denied, 270 Conn. 905, 853 A.2d 523, cert. denied, 543 U.S. 982, 125 S. Ct. 487, 160 L. Ed. 2d 361 (2004).

Lastly, we emphasize that "an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance." *State* v. *Hamilton*, supra, 228 Conn. 242.

Applying these factors to the present case, we conclude that the court did not abuse its discretion when it denied the defendant's motion for a continuance. First, the court properly took into account the timing of the request and the length of the likely delay. At the time of the defendant's motion for a continuance on September 29, 2008, his arrest for the victim's murder had occurred more than three years earlier on June 29, 2005. The case had been continued at the request of the defendant on at least two prior occasions.[5] The defendant had more than two years to have the swabs tested.[6] The defendant's motion for a continuance was

[5] On August 24, 2005, the defendant sought a sixty day continuance to review a disclosure by the state. On November 6, 2006, the defendant requested an additional month to track the codefendant's case.

[6] The forensic examiner who conducted the original DNA testing tested twenty-two swabs from the crime scene. The swabs were submitted for testing on July 25, 2006, and a written report was finalized on September 21, 2006. The defendant had over two years between the date of submission

made on the fourteenth day of jury selection when thirteen jurors already had been selected. The court polled the jurors who had already been chosen, and the majority of them either were unable to serve as jurors if the trial were delayed for one month or the clerk was unable to reach them. "[A] trial court properly may consider interests of judicial economy when exercising its discretion in granting or denying a request for a continuance." *State* v. *Delgado*, 261 Conn. 708, 716, 805 A.2d 705 (2002). In the present case, "it was reasonable for the trial court to have concluded that a thirty day continuance would have resulted in an unreasonably lengthy delay that would have imposed a significant burden on the witnesses and jurors." Id.; see also *State* v. *Brown*, 242 Conn. 445, 453–54, 460–61, 700 A.2d 1089 (1997) (affirming denial of midtrial motion for continuance to test newly available DNA evidence on basis of consideration of length of requested continuance and negative effect on jury); *State* v. *Ortiz*, 40 Conn. App. 374, 386–87, 671 A.2d 389 (affirming trial court's denial of defendant's motion for continuance made after six jurors had been picked and witnesses had been subpoenaed), cert. denied, 236 Conn. 916, 673 A.2d 1144 (1996). Accordingly, the trial court reasonably concluded that judicial economy would not have been served by granting a thirty day continuance.

Second, the reasons the defendant proffered in support of his request for a continuance were speculative. Our Supreme Court has held that "a trial court does not act arbitrarily or unreasonably when it denies a motion for a continuance that is supported by mere speculation." *State* v. *Delgado*, supra, 261 Conn. 714–15. In making his argument for a continuance, the defendant acknowledged that his trial strategy changed from one in which he perceived the state's case to consist

of this report and the date of trial to request that the remaining twenty-one swabs be tested.

of "a [single] DNA hit on the defendant [on the box
cutter found at the crime scene] and circumstantial
evidence putting him at the scene . . . and denials that
he was there," to one of mere presence at the scene of
the crime without participation in the victim's murder.
In support of his new defense strategy, the defendant
requested further DNA testing of twenty-one previously
untested swabs from the crime scene. The defendant
was therefore, in essence, gambling that the new testing
would not further link him to the crime scene. Prior to
the court's decision on the defendant's motion, defense
counsel acknowledged that further testing could "blow
up," further implicating the defendant. More DNA test-
ing could have further implicated the defendant in the
crime if more of the defendant's DNA was found at the
crime scene. In no event, however, could further testing
have exonerated him, because the state's testing already
linked his DNA to blood found on the box cutter appar-
ently used to assault the victim. The defendant's request
for a delay was an attempt, in essence, to gamble on
the possibility of diluting the evidentiary significance
of the single specimen of the defendant's blood found
at the crime scene by demonstrating that his DNA was
not found elsewhere at the crime scene. We conclude
that the speculative nature of the reasons advanced by
defense counsel in support of his request for a continu-
ance gave the trial court no reason to grant his motion
for a continuance. See *State* v. *Delgado,* supra, 261
Conn. 714–15.

Third, the defendant is unable to show any specific
harm that resulted from the court's denial of his request
for a continuance. At the time that the court denied
the defendant's motion for a continuance to have the
previously untested swabs tested, the court stated that
it would revisit the need to grant a continuance based
on the results of the DNA testing. The court ordered
the state to send the swabs to the state laboratory for

testing and entered an order on October 1, 2008, to expedite the testing of the swabs. At that point, the state laboratory estimated that the testing would not be complete until October 30, 2008. On October 10, counsel for both parties and the court received a preliminary oral report from the state laboratory that linked the defendant's DNA to a mixture of DNA found on the garage door at the crime scene. The state laboratory also indicated that a full, written report would be available within a week. Following the disclosure of that preliminary report, the state indicated that it would rest its case pending a request to reopen evidence to admit the new DNA evidence. After the court addressed the preliminary DNA report with the parties, the jury was brought back in and the state rested its case. Subsequently, the defendant rested his case without presenting any evidence. On the morning of October 14, 2008, four days after both parties were informed that the preliminary DNA report further implicated the defendant, the parties gave final arguments. Prior to the jury being charged, the state indicated that it had received a copy of the final DNA report from the state laboratory.[7] The court asked both parties whether they would be moving to reopen the evidence on the basis of the report. The state indicated that it would not move to reopen the evidence. The court then stated that if the defendant made a motion to reopen the evidence, despite the fact that it came after closing arguments, the court would be amenable to reopening the evidence if it served the interests of justice. Defense counsel argued that the data in the report could be interpreted in different ways and that without examining the DNA

---

[7] The DNA report indicated that the defendant was included as a contributor to the DNA profile from swab #18, which the report states was a "mixture." The report does not indicate what type of biological matter was in that mixture. The victim could not be eliminated as a minor contributor to the DNA sample from swab #18. Adeyemi was eliminated as a contributor to the DNA found on swab #18.

work sheets, which were not included in the written report, he was not prepared to move to reopen the evidence.[8] Ultimately, defense counsel stated that he would not take a position either way on reopening the evidence and the court subsequently delivered the jury charge.

The defendant claims that by the time he presented his closing argument, he had already committed himself to the strategy of minimizing the significance of the single specimen of the defendant's DNA which was found at the scene of the crime. Defense counsel was aware of the results of the DNA testing *before* the court proceeded with its jury charge, despite being given the opportunity by the court to consider reopening the evidence to present the new DNA evidence. Defense counsel argued that he was already tied to the strategy presented to the jury during closing argument, which was to claim the mere presence of his client at the crime scene, without participation by him in the crime.

___

[8] Defense counsel claims that he would need to take a look at the backup work sheets underlying the report in order to make an informed decision whether to reopen the evidence. In the defendant's motion for a new trial filed on October 22, 2008, the defendant states: "*It was clear from the report* [provided to counsel in court on October 14, 2008] that the defendant was included as a contributor to a mixture on the back garage door which was consistent with his videotaped statement. *It was also clear* [from the same report] that the codefendant Tyehimba Adeyemi was included in one area of the door leading between the office and garage and could not be eliminated from another area of that same door." (Emphasis added.) At oral argument, when the defendant's appellate counsel was asked whether the defendant's trial counsel's new-found clarity was a result of examining the backup work sheets, counsel replied that it was not. Therefore, the defendant concedes that he was not presented with any new evidence between October 14, 2008, when, following his closing arguments, he was presented with the DNA report, and October 22, 2008, when the defendant filed his motion for a new trial. That concession demonstrates that the defendant had all the information necessary on October 14 when the court gave him the option to file a motion to reopen the evidence. The defendant's defense was not impaired by the court's denial of his motion for a continuance, because, roughly two weeks following the denial of the motion, when presented with the complete DNA report, the defendant opted not to reopen the evidence.

As part of that strategy, defense counsel argued that the evidence presented at trial showed that at the entire crime scene there was only a single specimen of the defendant's DNA linking him to the crime scene, which was consistent with the defendant's theory that his codefendant was the sole actor in the commission of the victim's murder. The defendant contends that by October 14, following closing argument, it would have been inconsistent with the position he took during closing argument to introduce evidence of a second specimen of the defendant's DNA linking him to the crime scene. Defense counsel, however, was alerted to that new information four days earlier, when the state laboratory relayed a preliminary, oral report that indicated that there was a second specimen of the defendant's DNA at the crime scene. Defense counsel thus had the opportunity to determine whether to move to reopen the evidence *prior to* presenting his closing argument. Instead, during his closing argument, defense counsel chose to take the position that there was only *a single* specimen of the defendant's DNA linking him to the crime scene, despite counsel's knowledge that supplemental testing had found a *second* specimen of the defendant's DNA at the crime scene. When presented with the state laboratory's final written report after closing argument, which was consistent with the preliminary oral report, defense counsel again failed to move to reopen evidence based on the strategy that he chose to take at closing argument, despite his knowledge of evidence to the contrary.

When the court denied the defendant's motion for a continuance, the court stated that it would be receptive to continuing the trial if the need arose. The court did exactly that. After the expedited testing results became available, first in a preliminary oral report and then in the final written report, the defendant twice decided *not* to move to reopen the evidence despite the court's

representation that it would be amenable to so doing
in order to admit the new test results. The defendant's
claim on appeal is inconsistent with the position he
took at trial. We conclude, therefore, that "[t]here is
nothing in the record to indicate that the defendant's
ability to defend himself was impaired substantially by
the trial court's decision to deny defense counsel's
request for a continuance." *State* v. *Delgado*, supra, 261
Conn. 717.

Finally, the defendant argues that the court was
unreasonable in allowing the state to use the "late"
inculpatory statements from the March 16, 2006 poly-
graph interview, but not allowing the defendant to
access "critical scientific evidence." We disagree.

The essence of the defendant's argument is that he
was surprised by the state's disclosure of the tape and
that due to the late disclosure of such critical evidence,
it was unfair not to allow the defense time to test the
remaining DNA samples from the crime scene. First, it
is worth noting again that the court found that the
statements made by the defendant on the tape did *not*
constitute a late disclosure of evidence.[9] Although the
court did note that prior to the enhancement of the
tape, the police officers who were present during the
interview that preceded the polygraph examination and
the defendant himself were the only individuals who
were aware of the statements made by the defendant,
the substance of the defendant's statements was not
new evidence.[10] Whether or not defense counsel was

---

[9] The defendant does not appeal from the court's denial of his motion to
exclude the statements on the ground that it constituted a late disclosure,
nor does he appeal from its refusal to exclude the statements made during
the prepolygraph interview on constitutional grounds.

[10] The state claims that there was one report generated from the March
16, 2006 polygraph by state police, where a New Haven police detective,
Martin Dadio, also was present. The state claims that the report generated
by Dadio only documents that he was present but does not detail what the
defendant said. The report does make reference to the fact that the interview
and polygraph were videotaped. Defense counsel stated: "It's [Dadio's]

aware of the substance of the statements that were recorded on the tape, defense counsel was aware of the presence of the tape and asked the state about it prior to the commencement of trial. The defendant argues that he believed that the tape was unusable as evidence; however, there is no reason that the substance of the statements made by the defendant during that interview would not have been admissible evidence at trial. Furthermore, defense counsel had nearly two years to ask his client what he said to the police during the prepolygraph interview in anticipation of the state calling as witnesses at trial, either the state trooper who conducted the interview or the New Haven police officer who observed it.[11]

On the basis of our review of the aforementioned factors, we cannot conclude that the court's denial of the request for a continuance was arbitrary or unreasonable under the circumstances of the case.[12] The court,

report that as I was going through it and preparing my folders and when I was making a list of things that I was asking for from [the state] as I was preparing for the trial and . . . that's when I asked for certain tapes and cassette tapes, and when I gave him that list of cassette tapes it was that Dadio report that I looked at and I said, well, there's a videotape." When the defendant inquired about the videotape from the state, the state was not aware of the contents of the videotape but then sought to review the videotape at some point in "the middle of September, roughly." When the court inquired as to how long the state had been in possession of the videotape, the prosecutor could not recall on the spot when he received the videotape but stated that when the state did receive it, he advised the defendant. The court noted that prior to the audio being enhanced, the only people who knew what the defendant said at the polygraph were the police officers who attended it and the defendant himself.

[11] The defendant argues in his brief that he had no basis to believe, in advance of the polygraph examination, that there would be a general interview of the defendant on the merits of the case "beyond merely the protocols for the polygraph examination." However, defense counsel told the court, "I'm not suggesting to the court . . . that we didn't know what he was going to say at the time that he did speak to the polygraph. I would never let someone go up to have a polygraph exam without knowing what their . . . position was going to be."

[12] Because we conclude that the court's denial of the defendant's motion for a continuance was neither arbitrary nor unreasonable, we need not

therefore, did not abuse its discretion in denying the defendant's request. See *State* v. *Hamilton*, supra, 228 Conn. 249–50.

The judgment is affirmed.

In this opinion the other judges concurred.

engage in a harmless error analysis. See *State* v. *Hamilton*, supra, 228 Conn. 242.