******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ADAM BENEDICT
(AC 32484)

Sheldon, Mullins and Schaller, Js.

*Argued March 10—officially released July 21, 2015*

(Appeal from Superior Court, judicial district of
Litchfield, Ginocchio, J.)

*William J. Ward*, with whom, on the brief, was *William F. Gallagher*, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *David S. Shepack*, state's attorney, and *David R. Shannon*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. This case returns to this court following a remand from our Supreme Court. The defendant, Adam Benedict, was convicted of one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (6).[1] In *State* v. *Benedict*, 136 Conn. App. 36, 50, 43 A.3d 772 (2012), rev'd, 313 Conn. 494, 98 A.3d 42 (2014), we reversed the judgment of conviction and remanded the case for a new trial as a result of our conclusion that the trial court had "deprived the defendant of any meaningful opportunity to gain the benefit of an inference adverse to the complainant's credibility based on the pendency of her criminal charge."[2] We further concluded that the state had failed to establish that this error was harmless beyond a reasonable doubt. Id., 51. Finally, we determined, in anticipation of the same issue again arising on retrial, that the court had abused its discretion in admitting into evidence the defendant's login identification for a social media website (login identification). Id., 54.

Our Supreme Court reversed our determination that the defendant's right to confrontation had been violated. *State* v. *Benedict*, 313 Conn. 494, 510, 98 A.3d 42 (2014). It remanded the case back to this court with instruction to consider the defendant's other claims on appeal, including whether the defendant had established harm as a result of the erroneous admission of the login identification.[3] Id., 515.

In this appeal, the defendant claims that (1) the trial court violated his state and federal constitutional rights to a fair trial by denying his challenge for cause to a venireperson and his request for a continuance to investigate and potentially to challenge the jury array, and (2) he suffered harm as a result of the court's erroneous ruling regarding the login identification. We are not persuaded by the defendant's claims and, therefore, affirm the judgment of the trial court.

Our Supreme Court set forth the following facts in its opinion. "At all relevant times, the complainant was a seventeen year old senior at Litchfield High School, and the defendant was a substitute teacher and athletic coach at that school. The defendant first contacted the complainant outside of school in January or February, 2007. A week or two later, the defendant called the complainant while she was visiting a friend's residence and offered to pick her up. The complainant agreed. When the defendant and his friend arrived at the . . . residence [where the complainant was visiting], the defendant appeared to be intoxicated. After the defendant's friend drove the defendant and the complainant to the defendant's residence, the friend departed. Upon entering the defendant's residence, the complainant followed him into his bedroom, where he kissed her, took off her shirt, kissed her chest and sucked on her breasts.

Then the defendant, still clothed, rubbed his genital region against the complainant's leg and requested that she allow him to ejaculate on her breasts or face. Thereafter, the defendant exposed his penis and requested that the complainant perform fellatio on him. When the complainant refused, the defendant returned his penis to his pants and continued rubbing his genital region against her leg until he ejaculated. After changing his clothing, the defendant lay down on the bed with the complainant, kissed her, squeezed her breasts and fell asleep. The complainant remained at the defendant's residence until the following morning.

"After her graduation from high school, in June or July, 2007, the complainant, accompanied by her boyfriend and another female complainant, went to the state police barracks in Litchfield to file a complaint against the defendant. On the basis of that complaint, the defendant was later arrested and charged with three counts of sexual assault in the fourth degree in violation of § 53a–73a (a) (6).[4] Two counts related to separate alleged incidents involving sexual contact between the defendant and the complainant, and one count related to a third alleged incident involving sexual contact between the defendant and the other female complainant." (Footnote added; internal quotation marks omitted.) Id. 497–98. Following his conviction, the trial court sentenced the defendant to one year incarceration, execution suspended after ninety days, and three years of probation with special conditions. *State* v. *Benedict*, supra, 136 Conn. App. 40. The defendant's appeal followed.

As instructed by our Supreme Court, we now consider the defendant's claim that his constitutional rights to a fair trial were violated as a result of the trial court's denials of his challenge for cause to a venireperson and his request for a continuance to challenge the jury array. We also address the defendant's claim that the improper admission of his login identification into evidence constituted harmful error. We affirm the judgment of conviction.

I

The defendant first claims that the court improperly violated his state and federal constitutional rights[5] to a fair trial by denying his challenge for cause to a venireperson and his request for a continuance to challenge the jury array. As to the former claim, the defendant argues that the court should have excused J.J., a police officer who had a connection with the law enforcement agency that had investigated the defendant sufficient to constitute a principal challenge, on the basis of which the disqualification of J.J. was required.[6] As to the latter claim, the defendant contends that the court abused its discretion by denying a continuance so that he could have investigated whether a disproportionate number of the members of the array had connections to law

enforcement agencies. We disagree with both claims.

As a preliminary matter, we set forth certain relevant legal principles that guide the resolution of the defendant's two claims regarding the makeup of the jury. "Our jurisprudence on the issue of the right to an impartial jury is well settled. Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . [Article first, § 8, and the sixth amendment require] that a criminal defendant be given a fair trial before an . . . unprejudiced jury . . . ." (Footnotes omitted; internal quotation marks omitted.) *State* v. *Roman*, 262 Conn. 718, 725–26, 817 A.2d 100 (2003); see also *State* v. *Kamel*, 115 Conn. App. 338, 343, 972 A.2d 780 (2009). Put another way, "[t]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." (Internal quotation mark omitted.) *State* v. *Ziel*, 197 Conn 60, 64, 495 A.2d 1050 (1985). Guided by these principles, we turn to the defendant's specific claims.

A

The defendant first claims that the court should have excused J.J., a police officer who had a connection with the law enforcement agency that had investigated the defendant sufficient to constitute a principal challenge. He further contends that because a principal challenge existed, the disqualification of J.J. was presumed.[7] The state counters that the defendant failed to sustain his burden of proving that a sufficiently close relationship existed to support the principal challenge. We agree with the state.

The following facts are necessary for our resolution of this claim. Near the end of the first day of jury selection, and after the defendant had used his final preemptory challenge,[8] J.J. appeared for voir dire examination. He testified that he was employed as a police officer in Southbury and indicated that he could not think of any reason that he could not be fair and impartial in this criminal case. He informed the court that he had been a police officer for almost four years and that prior to that he had worked in sales.

The prosecutor then questioned J.J. and asked if municipal police officers did "not like" state police troopers and if he had a bias against state troopers. J.J. responded: "No. I don't think so. Also, in Southbury, my boss . . . is a state trooper."[9] J.J. then indicated that in Southbury, there were twenty-six police officers and one state trooper.

Defense counsel then questioned J.J., and the follow-

ing colloquy ensued:

"Q. I wasn't nervous until I saw that you were a police officer. That doesn't give me some reason to be nervous, now? I mean, you understand we're the defendant in this case. My client's been arrested by the state police and you work, or your immediate boss works for the state police. I guess the question is, do I have a reason to be nervous? I mean, you work for the state police. You said that. Is that correct?

"A. I work under the state police. Yes.

"Q. Right.

"A. That's correct.

"Q. And it was a state police that arrested him.

"A. Okay.

"Q. So, I mean. Is he sitting at any disadvantage at all with you because of that as we sit here?

"A. I say, no. He's not.

"Q. Absolutely not?

"A. No.

"Q. All right.

"A. I have no opinion about this whatsoever.

"Q. Okay.

"A. I have no opinion about anything I've heard so far."

J.J. indicated that he would not give any state trooper who testified any more credibility than the defendant. Defense counsel then identified by name the state troopers who would be testifying, and J.J. denied knowing any of them.

Defense counsel then challenged J.J. for cause. He argued as follows: "He works for the very department that investigated this crime. He works for the state police department. He said he works under the state police. The state police are the ones who investigated it. They are the ones who arrested [the defendant]. And regardless of the fact that he can put it aside, he works for them. So, essentially, he works for the very people who are going to be testifying." The prosecutor countered that J.J. was employed by the town of Southbury and not the state police. Defense counsel stressed that his challenge was not because J.J. was a police officer, but was because he was a police officer who worked under the state police. The prosecutor noted that the state trooper who worked in Southbury was not in the same troop as the state troopers involved in the investigation of this case. The court, noting that J.J. did not know any of the state troopers involved, even remotely, denied the defendant's challenge for cause.

The next day, defense counsel iterated his objection

to J.J. Specifically, he argued that it was "far-fetched" to think that a police officer of less than four years would feel free to acquit the defendant and that "[t]he razzing [J.J.] would get when he returns to that department if [the jury] come[s] back with a not guilty verdict would jeopardize his continued employment . . . ." Defense counsel also speculated that J.J. might, at some point, encounter one of the state troopers involved in this case. After hearing further argument from the parties, the court denied the defendant's renewed challenge to remove J.J. for cause.

The defendant raised only a common-law principal challenge to J.J. See, e.g., *Morgan* v. *St. Francis Hospital & Medical Center*, 216 Conn. 621, 623, 583 A.2d 630 (1990) (disqualification of juror may be based on General Statutes or common law); *McCarten* v. *Connecticut Co.*, 103 Conn. 537, 542, 131 A. 505 (1925) (common-law challenge for cause either principal challenge or challenge to favor). "A principal challenge may arise when the connection between the prospective juror and either party is of so close a nature that, *when the facts concerning the relationship or interest are proven* or when the prospective juror has formed or expressed an opinion on the question at issue, the disqualification is conclusively presumed." (Emphasis added; internal quotation marks omitted.) *State* v. *Esposito*, 223 Conn. 299, 330, 613 A.2d 242 (1992); *State* v. *Rigual*, 256 Conn. 1, 22–23 n.4, 771 A.2d 939 (2001); *Morgan* v. *St. Francis Hospital & Medical Center*, supra, 624 (principal challenge for cause is for absolute disqualification or bias); see also *Johnson* v. *New Britain General Hospital*, 203 Conn. 570, 581, 525 A.2d 1319 (1987).[10]

This court has ruled that a principal challenge must be granted when there is an "inextricably close relationship" between that potential juror and a party. *State* v. *Jones*, 51 Conn. App. 126, 132, 721 A.2d 903 (1998), cert. denied, 247 Conn. 958, 723 A.2d 814 (1999). Such a relationship exists when, for example, "the juror is related to either of the parties, has been an arbitrator on either side, has an interest in the case . . . where he has been bribed, or has been a juror in the same cause, *or is the party's master, servant*, steward, attorney, landlord, or tenant"; where such a relationship is established, the "juror must be excused." (Internal quotation marks omitted.) *State* v. *Griffin*, 251 Conn. 671, 693, 741 A.2d 913 (1999); *State* v. *Rigual*, supra, 256 Conn. 23 n.4; *State* v. *Esposito*, supra, 223 Conn. 309 n.7. The defendant claims that his principal challenge should have been granted due to the inextricably close relationship between the challenged venireperson and the state police.

Finally, we set forth our standard of review. As a general matter, "[t]he trial court is vested with wide discretion in determining the competency of jurors to

serve, and that judgment will not be disturbed absent a showing of an abuse of discretion. . . . In exercising this discretion the trial court must zealously protect the rights of the accused." (Citation omitted; internal quotation marks omitted.) *State* v. *Esposito*, supra, 223 Conn. 310; see also *Morgan* v. *St. Francis Hospital & Medical Center*, supra, 216 Conn. 625. It is the defendant's burden, however, to raise his claim from "the realm of speculation to the realm of fact." (Internal quotation marks omitted.) *Morgan* v. *St. Francis Hospital & Medical Center*, supra, 626; *Johnson* v. *New Britain General Hospital*, supra, 203 Conn. 582. In the present case, however, the dispositive question is whether the court improperly failed to find that a master-servant relationship existed between J.J. and the state police. That determination presents a factual question. See *State* v. *Esposito*, supra, 309 (principal challenge arises when relationship between prospective juror and party is proven). We review the court's finding that a master-servant relationship did not exist under the clearly erroneous standard. See *State* v. *Santiago*, 252 Conn. 635, 640, 748 A.2d 293, (2000) (factual findings reviewed under clearly erroneous standard).

The defendant argues that J.J. had "some professional tie or relationship" with the state police, the law enforcement agency that had investigated the criminal conduct in this case. He acknowledged in his appellate brief that the nature and extent of this connection was "not entirely clear." Nevertheless, he maintains that the connection between J.J. and the state police was sufficient to warrant J.J.'s removal for cause from the jury. We disagree.

The defendant bore the burden of establishing that the connection between J.J. and the state police rose to the level of a master-servant relationship, and therefore that J.J. should have been excused for cause. We agree with the state that the defendant failed to meet that burden. During voir dire, J.J. admitted that his "boss" was a state police sergeant. He later stated that he worked under the state police. J.J. indicated that he did not know any of the state troopers who would be testifying on behalf of the state. He further represented that he would not afford the testimony of members of law enforcement agencies any greater credence than other witnesses. Defense counsel did not challenge the prosecutor's argument that J.J. was employed by the town of Southbury, not the state police, and that the state police sergeant was not from Troop L,[11] where the state trooper witnesses in this case were assigned. We also note that defense counsel failed to ask J.J. questions regarding the scope, nature, or level of supervision he received from the state police sergeant in Southbury, or any details regarding their relationship. In short, we cannot say that the court committed clear error by not finding a master-servant relationship, given the sparse details regarding the nature of the relation-

ship between the state police and the officers of the Southbury Police Department.[12] We conclude, therefore, that the court did not abuse its discretion in denying the defendant's principal challenge with respect to J.J.

B

The defendant next claims that the court improperly denied his request for a continuance to investigate and potentially to challenge the jury array. Specifically, he argues that the court should have granted his request for a continuance in order to properly hear and determine his claim that a disproportionate number of persons with connections to law enforcement were members of the venire panel. The state counters that after considering the applicable factors, the court acted within its broad discretion in denying the defendant's request. We agree with the state.

The following additional facts are necessary for our discussion. At the start of the second day of jury selection, the defense counsel stated that he wanted to challenge the array of potential jurors. Specifically, he argued that there was an irregularity in the composition of the venire jury panel in that too many members were either law enforcement personnel or related to members of law enforcement agencies. He argued that, on each day, six out of thirty people in the array were law enforcement personnel or related to members of law enforcement agencies. Defense counsel later clarified that he was requesting a continuance to challenge the jury array.

The prosecutor objected, arguing that there was no basis to challenge the array. The court inquired how defense counsel would proceed if a continuance was granted. Defense counsel explained: "I see six police officers on today's [list of prospective jurors]. I saw six, either related or police officers, yesterday. And I'm not challenging it based on the fact that there's an inordinate [number of] police officers. I'm challenging it based on the fact that there may be some irregularity in the process that—put us with an inordinate [number of] police officers." He later iterated that an "irregularity" in the process resulted in an unusually large number of law enforcement personnel or persons related to members of law enforcement agencies in the array.

The court stated that nothing proffered by defense counsel demonstrated any defect in the process of selecting the array, but that it would provide an opportunity for him to make a record as to how the members of the array had been summoned. Defense counsel acknowledged that he was "not sure" of the process, and that was why he had requested a continuance. The court then declined to grant a continuance and denied the motion to challenge the array.

We now set forth our standard of review and the

relevant legal principles. "The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. . . . In the event that the trial court acted unreasonably in denying a continuance, the reviewing court must also engage in harmless error analysis. . . .

"Among the factors that may enter into the court's exercise of discretion in considering a request for a continuance are the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing of the request; [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . .

"Lastly, we emphasize that an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Davis*, 135 Conn. App. 385, 393–94, 42 A.3d 446, cert. denied, 305 Conn. 916, 46 A.3d 171 (2012); see also *State* v. *Spells*, 76 Conn. App. 67, 75, 818 A.2d 808 (2003).

We acknowledge that defense counsel raised his concern regarding the array in a prompt and timely manner. He did not, however, specify the length of the continuance that he was requesting. See generally *State* v. *Wright*, 70 Conn. App. 807, 821, 800 A.2d 1218 (appellate courts concluded no abuse of discretion where defendant sought indefinite delay of proceedings), cert. denied, 261 Conn. 930, 806 A.2d 1070 (2002). More importantly, for three of the six potential jurors[13] upon whom defense counsel based his suggestion that the array may have been improperly selected, there was nothing to suggest any type of systematic selection of law enforcement personnel, or individuals related thereto, for the defendant's panel. See *State* v. *Coney*,

266 Conn. 787, 802, 835 A.2d 977 (2003) ("[w]e have declined . . . to find prejudice in instances in which a defendant can do no more than offer mere conjecture or rank speculation as to the harm flowing from a denial of a continuance"). For these reasons, we conclude that the court did not abuse its discretion in denying the defendant's request for a continuance.

II

The defendant next claims that he was harmed by the court's erroneous admission into evidence of his login identification, smoothcriminal77. The state counters that the defendant failed to sustain his burden of establishing harm. We agree with the state.

The following additional facts, as stated in our prior opinion, are necessary for the resolution of this claim. "During cross-examination of the defendant, defense counsel objected to the state's questioning of him regarding his MySpace login identification on the ground that it was irrelevant. The prosecutor responded: As far as what his login ID was, smooth criminal, if I didn't think he was going to call a bunch of character witnesses, his pastor and things like that, then, arguably, I don't know that I would offer it. But if there's going to be a bunch of character witnesses to say what a good person he is, I think it becomes relevant. In ruling on the objection, the court stated: I'm going to sustain your objection in most part. You can put the title of the—if it's an identification . . . feature of a Facebook, I'll allow it in for that purpose. . . . I am sustaining your objection 90 percent of what the content of the song is, but it's an identifying feature on Facebook or Twitter, or whatever, I'll allow it in just for that purpose. Okay . . . ? Defense counsel responded, [s]o it's limited to the title of the song.[14] The court inquired, [o]kay? to which defense counsel answered, [t]hank you.

"After the defendant testified, defense counsel indicated that he did indeed intend to call character witnesses to testify. The state objected to the admission of character witnesses on the ground, among others, that the admission of general character evidence was improper. The court determined, pursuant to § 4-4 of the Connecticut Code of Evidence, that the defendant's character witnesses could testify, but only as to the defendant's character trait of not having sexual contact with students. During his cross-examination of three of the defendant's character witnesses, the prosecutor referred to the defendant's login identification and inquired about whether the witnesses knew if the defendant was the type of person who would have such an identification. These references constitute the basis of the defendant's claim." (Footnote omitted; internal quotation marks omitted.) *State* v. *Benedict*, supra, 136 Conn. App. 54–55.

On remand, our Supreme Court instructed us to consider whether the defendant had been harmed as a result of the admission of the login identification into evidence. "The Appellate Court never considered the issue of whether the defendant proved that the evidentiary error was harmful. The Appellate Court's consideration of this question was unnecessary in light of its resolution of the defendant's confrontation claim, which independently required reversal of the judgment and a remand for a new trial. In the absence of the necessary predicate for a new trial on the basis of the evidentiary error—a determination of harm—the Appellate Court will be required to consider this issue as part of its consideration of the defendant's remaining claims upon remand. See *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 254, 9 A.3d 364 (2010) ([B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Benedict*, supra, 313 Conn. 516.[15]

We now set forth the relevant law and our standard of review. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [*A*] *nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . Put another way, [w]here evidentiary error is claimed, the defendant bears the burden of proving the harmfulness of the error before a new trial will be granted.* (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Gonzalez*, 106 Conn. App. 238, 248–49, 941 A.2d 989, cert. denied, 287 Conn. 903, 947 A.2d 343 (2008); see also *State* v. *Giovanni P.*, 155 Conn. App. 322, 329, 110 A.3d 442, cert. denied, 316 Conn. 909, 111 A.3d 883 (2015).

We recently have explained the rationale behind the harmless error doctrine. "[T]he appellate harmless error doctrine is rooted in [the] fundamental purpose of our criminal justice system—to convict the guilty and acquit the innocent. The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." (Internal quotation marks omitted.) *State* v. *Maner*, 147 Conn. App. 761, 772, 83 A.3d 1182, cert. denied, 311 Conn. 935, 88 A.3d 550 (2014).

Our Supreme Court has explained that "[w]hether [an improper evidentiary ruling that is not constitutional

in nature] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict.'' (Internal quotation marks omitted.) *State* v. *Osimanti*, 299 Conn. 1, 18–19, 6 A.3d 790 (2010).

The references to the defendant's login identification did not play a significant role in this case. See *State* v. *Michael A.*, 99 Conn. App. 251, 271, 913 A.2d 1081 (2007). Aside from the short questioning[16] of the defendant during cross-examination, the prosecutor asked three of the defendant's witnesses one or two questions with respect to this topic.[17] The prosecutor did not make any reference to the login identification during his closing argument to the jury. Moreover, the defendant has not sustained his burden to demonstrate that the login identification evidence impacted the jury. See *State* v. *Franko*, 142 Conn. App. 451, 469, 64 A.3d 807, cert. denied, 310 Conn 901, 75 A.3d 30 (2013); see also *State* v. *LeBlanc*, 148 Conn. App. 503, 509–10, 84 A.3d 1242, 1245, cert. denied, 311 Conn. 945, 90 A.3d 975 (2014). The use of the login identification "smoothcriminal77" was not an important part of the state's case. Accordingly, we conclude that the defendant failed to show that the verdict was substantially swayed as a result of the improper evidentiary ruling.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was acquitted of two additional counts of sexual assault in the fourth degree in violation of § 53a-76a (a) (6). *State* v. *Benedict*, 136 Conn. App. 36, 38 n.1, 43 A.3d 772 (2012), rev'd, 313 Conn. 494, 98 A.3d 42 (2014). We also note that this appeal stems from the defendant's second trial on these charges. Id., 40 n.5. The defendant's first trial ended in a mistrial as the result of a deadlocked jury. Id.

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the complainant or others through whom the complainant's identify may be ascertained. See General Statutes § 54-86e.

[3] We note that our Supreme Court did not address the propriety of our determination that the admission of the login identification was erroneous. *State* v. *Benedict*, supra, 313 Conn. 515–16.

[4] General Statutes § 53a-73a provides in relevant part: "(a) A person is guilty of sexual assault in the fourth degree when . . . (6) such person is a school employee and subjects another person to sexual contact who is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs

the actor . . . ."

[5] We note that the defendant has abandoned any separate claim under our state constitution by failing to include a separate state constitutional analysis in his appellate brief. "Because the defendant has not set forth a separate state constitutional analysis pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we deem that claim abandoned and analyze the defendant's right to an impartial jury under the requirements of the United States constitution. See *State* v. *Simpson*, 286 Conn. 634, 651 n.17, 945 A.2d 449 (2008)." *State* v. *Stuart*, 113 Conn. App. 541, 547 n.2, 967 A.2d 532, cert. denied, 293 Conn. 922, 980 A.2d 914 (2009); see also *State* v. *Johnson*, 288 Conn. 236, 244 n.14, 951 A.2d 1257 (2008).

[6] To protect the privacy interest of the members of the jury, we refer to them by their first and last initials. *State* v. *Gonzalez*, 315 Conn. 564, 569 n.3, 109 A.3d 453 (2015).

[7] We note that "[t]he mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial." (Internal quotation marks omitted.) *State* v. *Clark*, 164 Conn. 224, 227, 319 A.2d 398 (1973).

[8] See *State* v. *Vitale*, 190 Conn. 219, 224–25, 460 A.2d 961 (1983) (where defendant has failed to exhaust right of peremptory challenge, it is no ground for granting new trial that challenge for cause was overruled); *State* v. *Hoyt*, 47 Conn. 518, 529 (1880) (defendant not aggrieved where impaneling of jury was completed without exhausting right of peremptory challenge).

[9] During J.J.'s response, the prosecutor stated: "Oh. That's right. You're [supervisor is] a state resident trooper."

[10] The Ohio Supreme Court has provided the historical context of the common-law principal challenge. "At common law, jurors could be challenged propter affectum because some circumstance, such as kinship with a party, render[ed] the potential juror incompetent to serve in the particular case. Black's Law Dictionary (8th Ed. 2004) . . . . Challenges propter affectum took two forms: principal challenges and challenges to the favor. 2 Blackstone, Commentaries on the Laws of England, *363. A principal challenge is one where the cause assigned carries with it prima facie evident marks of suspicion either of malice or favor . . . which, if true, cannot be overruled, for jurors must be omni exceptione majors (above all challenge). . . . Thus, where a party establishes the existence of facts supporting a principal challenge, this finding result[s] in automatic disqualification, and no rehabilitation of the potential juror can occur. Black's Law Dictionary [supra]. Blackstone sets forth several basic principal challenges in his Commentaries, including instances where a juror is of kin to either party within the ninth degree, where a potential juror has an interest in the cause, or where the potential juror is the party's master, servant, counsellor, steward, or attorney, or of the same society or corporation with him." (Citation omitted; internal quotation marks omitted.) *Hall* v. *Banc One Mgt. Corp.*, 114 Ohio St. 3d 484, 487–88, 873 N.E.2d 290 (2007).

[11] According to the state's Department of Emergency Services and Public Protection website, Troop L of the state police patrols the following towns: Kent, Washington, Warren, Litchfield, Morris, Bethlehem, Woodbury, Harwinton, Thomaston, Plymouth, Canton, Burlington, and Bristol. See State of Connecticut, Department of Emergency Service and Public Protection, "Connecticut State Police Facilities," (last modified August 16, 2012), available at http://www.ct.gov/despp/lib/despp/dsp/csp_troops_2012_20120816.pdf (last visited July 8, 2015).

[12] The United States Supreme Court's decision in *Crawford* v. *United States*, 212 U.S. 183, 29 S. Ct. 260, 53 L. Ed. 465 (1909), provides an example of when a party has met his or her burden of proving the existence of a master-servant relationship. In that case the defendant was charged with conspiracy to defraud the United States by presenting false bills to the post office. Id., 185. One of the jurors, a pharmacist, operated a drug store that sold postal stamps and therefore, technically, was a clerk of the city postal service. Id., 192. Although the juror received only $300 in annual compensation for providing this service, "it is one of the things in connection with the drug business that can hardly be avoided; that a drug store, to keep up its prestige, must sell postage stamps, and might as well get paid for it as to do it for nothing." Id., 192–93. The trial court had denied the defendant's principal challenge to this juror. Id. 193. The United States Supreme Court determined that the common-law rules regarding principal challenges remained in effect despite the existence of statutes regarding the competence of juror in the District of Columbia. Id., 194–96. "The position of the juror in this case is a good instance of the wisdom of the rule. His position

was that of an employ[ee] who received a salary from the United States, and his employment was valuable to him, not so much for the salary as for the prospect such employment held out for an increase in his business from the people who might at first come to his store for the purchase of stamps, etc. It need not be assumed that any cessation of that employment would actually follow a verdict against the Government. It is enough that it might possibly be the case; and the juror ought not to be permitted to occupy a position of that nature to the possible injury of a defendant on trial, even though he should swear he would not be influenced by his relations to one of the parties to the suit in giving a verdict. It was error to overrule the defendant's challenge to the juror." Id., 196–97; see also *State* v. *Ballard*, 718 So. 2d 521, 526 (La. App. 1998) ("[i]n other words, it was the master-servant (i.e., the employer-employee) relationship between the potential juror and the prosecution's complaining witness (the sheriff of Caddo Parish, the same parish in which defendant was being tried) that established the presence of bias"), aff'd, 747 So. 2d 1077 (La. 1999).

[13] On the first day of jury selection, V.D., the wife of a police officer was excused for cause, as was her husband J.D., a police sergeant. R.S., whose mother had been the head clerk at Troop L for twenty-three years, was the subject of a defense peremptory challenge. R.B., the former spouse of a state trooper, was accepted as a member of the jury. G.C., who was also the subject of a defense peremptory challenge, was an air marshal and the son of a police officer.

[14] Outside of the presence of the jury, the prosecutor explained to the court that the login identification referred to a song that is "about the break-in—the residential break-in of an apartment where a female is assaulted and left bleeding."

During cross-examination of the defendant, the following colloquy occurred:

"Q. And do you remember identifying it and say, 'Yes, that is my Facebook page?'

"A. Yes I do.

"Q. And do you remember that your login at that time was smoothcriminal-77@facebook—@myspace.com, something to that effect?

"A. Yes. It was in reference to an Alien Ant Farms song. It had nothing to do with anything. [Seventy-seven] was the year I was born."

[15] We note that the defendant's appellate brief does not contain an extensive analysis of whether he was harmed by the admission into evidence of the login identification. Nevertheless, our Supreme Court instructed us to consider the issue of harm on remand. Furthermore, at oral argument before this court, both the defendant and the state addressed the question of harm. Under these facts and circumstances, we will consider whether the defendant was harmed as a result of the court's evidentiary ruling on the login identification.

[16] We also note the thrust of the prosecutor's questioning of the defendant was to challenge his credibility regarding his testimony from the first trial as to the last time that he had logged into that social media account.

[17] During the cross-examination of Gary Matcheson, the prosecutor asked: "And the Adam Benedict you know, is he the kind of person who would have, as a login or identifier for his MySpace page 'smoothcriminal77'?" Matcheson replied twice that he had "no idea."

During the cross-examination of Parker Ryan Strong, the prosecutor inquired if defense counsel had asked him how he would respond if asked whether the defendant's social media page would be "smooth criminal." Strong replied in the negative.

Finally, during the cross-examination of J. Brent Hawkins, the prosecutor asked if the defendant was the type of person who would have "smoothcriminal77" as a login for his MySpace page. Hawkins stated that he did not know anything about MySpace. Defense counsel objected, and the prosecutor withdrew the question. As a result, the court sustained the objection.

—————————————