# STATE OF CONNECTICUT *v.* FERDINAND R.[1]
## (AC 31878)

DiPentima, C. J., and Espinosa and Pellegrino, Js.

Argued September 15—officially released December 20, 2011

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

*Martin Zeldis*, public defender, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Maureen Ornousky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ESPINOSA, J. The defendant, Ferdinand R., appeals from the trial court's judgment of conviction, following a jury trial, of sexual assault in a spousal relationship in violation of General Statutes § 53a-70b (b). On appeal, the defendant claims that (1) the evidence at trial was insufficient to convict him and (2) the court erroneously admitted certain uncharged misconduct evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. After a few weeks of dating, the defendant married the victim on April 13, 2007. A justice of the peace performed the marriage ceremony in the defendant's apartment in Stamford. At the time of the marriage, the victim worked as a live-in housekeeper in New York City. This required her to be in New York Monday

through Friday, and occasionally on weekends. Typically, however, the victim spent weekends with the defendant at his apartment. At the end of her work week, the victim would travel by train from New York to Connecticut, and the defendant would pick her up at the train station. During the week, the two would talk to each other on the telephone almost every day. On July 15, 2007, the victim's employment contract ended, and she began working for a new employer in New York City on July 16, 2007. She also moved in with the defendant.

Almost immediately after they married, the defendant began treating the victim differently. More specifically, he became more possessive and jealous of the victim and began indicating that he thought that she was being unfaithful. This attitude shift toward the victim manifested in several incidents over the next two months. First, on July 13, 2007, when the victim asked the defendant to take her to the train station, the defendant grabbed a knife, put it in her hand and forced her to hold it to his chest. The victim told the defendant that she would not hurt him, and the defendant eventually took her to the train station.

On July 19, 2007, a burst pipe in the New York train station delayed the victim's return to Connecticut. When she finally arrived home late that night, the defendant refused to accept her explanation for returning so late. The defendant smashed a plate, picked up a knife and followed the victim into the living room, where he pushed her onto a table and cut her arm. When the victim accused him of cutting her and making her bleed, the defendant cut the palm of his own hand. The victim did not seek medical treatment or contact the police.

The next incident occurred on July 28, 2007. A family that the victim had met while working for her former employer invited her to have lunch with them. Upon

hearing this from the victim, the defendant went into the kitchen, got a knife and put the knife against her neck. The victim attempted to explain who the family was and tried to invite the defendant to join them. The defendant refused and would not let the victim spend time with the family until they came to the apartment and met with him. When they arrived, the family invited the defendant to join them; the defendant agreed and went to lunch with them and the victim.

One additional episode occurred before the events that led to the defendant's arrest. On August 22, 2007, the victim arrived at the apartment after work before the defendant. The victim called the defendant's sister and asked her to talk to the defendant about his increasingly threatening behavior. The victim was fearful of the defendant because he had been making threats, telling her to "watch out." The victim was still on the telephone with the sister when the defendant came home. When the victim asked the defendant to speak with his sister, he took off his belt and struck her with it two times. The victim pleaded with the defendant to stop, and she put the sister on speakerphone; the defendant relented when the sister threatened to call the police. The victim again did not contact the police regarding the incident.

The events that led to the defendant's arrest began the morning of September 14, 2007. After the victim got out of the shower, the defendant followed her into the living room and accused her of having an affair with her former employer in New York. The defendant then picked up the victim, saying that they should have sex. The victim told the defendant that she did not want to have sex and indicated that she was too tired and needed to go to work. Despite her protests, the defendant carried her into the bedroom, put her on the bed and proceeded to have sex with her. During the intercourse, the victim cried and told the defendant that she

did not want to have sex with him, but the defendant did not stop. Following intercourse, the victim got dressed, and the defendant drove her to the train station so that she could get to work.

During the day, the defendant called the victim to apologize, saying that he did not like what had happened. The victim remained upset by the incident, however, and halfway through the day she called the justice of the peace who had performed their marriage ceremony to ask where the nearest "domestic violence office" was. The justice of the peace met the victim at the train station and gave her directions to the nearest domestic violence crisis center. The staff at the crisis center told the victim that she had to go to the police, and the victim did so later that day. When she went to the police station, the victim told the police that her husband had started to beat her. The police tried to convince her to give a statement, but she refused and returned home in a taxi.

When the victim exited the taxi in front of the apartment, the defendant was waiting for her outside on the second floor veranda. He demanded that she come to him. Noticing that his face was red and that he seemed very upset, the victim refused and asked if she could go back to New York or sleep outside. The defendant repeated his demand that she come to him, and the victim turned and started to run away down the street. The defendant ran outside and chased her, catching up to her when she fell down and hurt her knee. The defendant then forcibly picked her up and began carrying her back to the apartment. The victim begged the defendant to let her go and yelled out for someone to call the police, saying that the defendant would beat and kill her. A neighbor who was walking home from a friend's house saw what was happening and heard the victim's cries for help; he went back to his friend's house and called the police.

The police arrived shortly thereafter and found the victim and the defendant in the middle of the street. The officers separated the two, taking the defendant into custody and taking the victim back to the police station. At the station, the victim gave a sworn statement to the police that included details about the problems that she and the defendant had been having and a description of the events of that morning.

The state charged the defendant with failure to register as a sex offender in connection with a prior unrelated conviction[2] and sexual assault in a spousal relationship. The defendant pleaded guilty to failure to register as a sex offender. The court denied the defendant's motion for a judgment of acquittal during the jury trial on the spousal sexual assault charge, and the jury returned a verdict of guilty. The court rendered judgment of guilty in accordance with the defendant's plea and the jury verdict, and sentenced the defendant to five years incarceration for failure to register as a sex offender and twenty years incarceration for sexual assault in a spousal relationship to be served consecutively to each other, for a total effective sentence of twenty-five years incarceration. The defendant filed the present appeal on January 4, 2011.

I

The defendant first claims that his conviction was improper because the evidence was insufficient to convict him of sexual assault in a spousal relationship under § 53a-70b (b). He argues that this court should interpret the statute to require proof beyond a reasonable doubt

---

[2] The defendant was convicted of sexual assault in the first degree in New York in October, 1990. He testified at trial that he had felony convictions, but the details of those convictions were not provided to the jury. He further testified that he only shared his background with the victim to a "certain extent," and that he only told her "good things." The jury reasonably could have found on the basis of this testimony that he concealed his criminal history from the victim.

that he (1) acted with the specific intent to commit the act of sexual assault and (2) used force greater than necessary to separate the victim's legs or made an immediate threat of use of force. The defendant bases these arguments on the theory that "marriage is different" and urges us to consider § 53a-70b in light of its history and purposes, and the fundamental differences between the act of sex between strangers or acquaintances and the act of sex between spouses. If we read the statute this way, the defendant argues, the evidence at trial was not sufficient to support his conviction. We reject the defendant's interpretation of § 53a-70b and conclude that the evidence at trial was sufficient to convict the defendant of sexual assault in a spousal relationship.

Questions of statutory interpretation are subject to plenary review by this court. See, e.g., *State* v. *Boyd*, 272 Conn. 72, 76, 861 A.2d 1155 (2004). When we are presented with the task of interpreting statutes, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes." General Statutes § 1-2z. Only if the statute is ambiguous on its face or application of the plain meaning of the text would yield an absurd or unworkable result do we consider extratextual evidence of the statute's meaning. See General Statutes § 1-2z. When we interpret statutory text, "the legislature, in amending or enacting statutes, always [is] presumed to have created a harmonious and consistent body of law . . . . Thus, we are required to read statutes together when they [are] related to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Citations omitted; internal quotation marks omitted.) *State* v. *Courchesne*, 296 Conn. 622, 709, 998 A.2d 1 (2010).

Section 53a-70b (b) provides: "No spouse or cohabitor shall compel the other spouse or cohabitor to engage in sexual intercourse by the use of force against such other spouse or cohabitor, or by the threat of the use of force against such other spouse or cohabitor which reasonably causes such other spouse or cohabitor to fear physical injury." Section 53a-70b (a) (2) defines "use of force" to mean "(A) Use of a dangerous instrument; or (B) use of actual physical force or violence or superior physical strength against the victim."

The plain language of the statute refutes the defendant's assertions regarding its mens rea requirement and its meaning of "use of force . . . ." First, as to the defendant's mens rea argument, there is no requirement in the text of the statute that, in order to be convicted, the defendant must have the specific intent to commit the act of sexual assault. Absent such language indicating the requisite mens rea, a statute should be read as requiring only that the defendant have a general intent to commit the act that constituted a violation of the statute. See *State* v. *Fagan*, 280 Conn. 69, 77, 905 A.2d 1101 (2006) ("[w]here a particular crime requires only a showing of general intent, the prosecution need not establish that the accused intended the precise harm or precise result which resulted from his acts" [internal quotation marks omitted]), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). Here, because the statute does not describe any particular specific intent, it creates a crime of general intent. The crime of sexual assault in a spousal relationship does not require that the defendant intended to sexually assault his spouse; it requires only that the defendant intended to do the act that amounts to a violation of § 53a-70b (b).

The plain text of the statute also refutes the defendant's assertions regarding the meaning of "use of force" within the statute. Section 53a-70b (a) (2) (B) provides that "use of actual physical force or violence

or superior physical strength against the victim" amounts to the "use of force" within the meaning of the statute. There is no qualifying language that says that the force must be greater than is necessary to separate the victim's legs. In addition, when § 53a-70b (b) prohibits threats of the use of force, it does not require that the threats be made immediately before the prohibited act. The defendant's concern that this leaves the statute without any principled boundaries regarding what threats will satisfy this requirement is without merit. Section 53a-70b (b) provides that the threatened use of force must "reasonably" cause the victim to fear physical injury. The statute makes the question one of reasonableness, and it is for the finder of fact to decide whether a threat of use of force that does not immediately precede an act could reasonably have caused the victim to fear physical injury at the time of the act.

The conclusions reached by interpreting the plain text of the statute are supported by considering the statute within the broader statutory scheme of which it is a part and by comparing it to related statutes. Specifically, these conclusions are consistent with the way our courts have interpreted sexual assault in the first degree. General Statutes § 53a-70 (a) (1) provides that an individual commits sexual assault in the first degree if the individual "compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person." The operative language here is identical to that used in § 53a-70b (b).[3] Our Supreme Court's interpretation

---

[3] The only difference between the relevant parts of the statutes is the reference to a "third person" in § 53a-70 (a) (1). Where § 53a-70b (b) requires that the use of force or the threat of the use of force be directed at the spouse or cohabitor who is compelled to engage in sexual intercourse, § 53a-70 (a) (1) applies to acts where the use of force or the threat of the use of

of § 53a-70 (a) (1) is consistent with our analysis of § 53a-70b. See *State* v. *Petitpas*, 299 Conn. 99, 105–106, 6 A.3d 1159 (2010) (defendant guilty of sexual assault in first degree even though force used was no greater than necessary to separate victim's legs); *State* v. *Kulmac*, 230 Conn. 43, 75–76, 644 A.2d 887 (1994) (jury could infer implied threat of use of force when victim did not resist but knew from past experiences that resistance would be futile); *State* v. *Smith*, 210 Conn. 132, 141, 554 A.2d 713 (1989) (sexual assault in the first degree requires only general intent).

The defendant argues that the existence of a separate statute for sexual assault in a spousal relationship should be considered evidence of a legislative intent to treat it differently from sexual assault in the first degree. This argument is unavailing. The legislature passed a separate spousal sexual assault statute to carve out a narrow exception to the affirmative defense of marriage to other sexual assault crimes. General Statutes § 53a-65 (2) limits the definition of "sexual intercourse" to intercourse between "persons not married to each other," except as applied to § 53a-70b. Our Supreme Court recognized that the legislature specifically amended § 53a-65 (2) to prevent application of its affirmative defense of marriage to acts charged under § 53a-70b. See *State* v. *Suggs*, 209 Conn. 733, 740–41, 553 A.2d 1110 (1989). There is nothing in the text of either statute or in the broader statutory scheme that suggests that we should read these identically worded statutes differently.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine

force is directed either at the individual who is compelled to engage in sexual intercourse or at a third person.

whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . We note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Rosario*, 113 Conn. App. 79, 86, 966 A.2d 249, cert. denied, 291 Conn. 912, 969 A.2d 176 (2009).

"In assessing the evidence at trial, it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. . . . It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness . . . and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial. . . . Furthermore, as a court of appellate review, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Hall*, 120 Conn. App. 191, 198–99, 991 A.2d 598, cert. denied, 297 Conn. 903, 994 A.2d 1288 (2010). "[T]he inquiry into whether the record evidence would

support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 801, 877 A.2d 739 (2005).

Applying § 53a-70b (b) according to its plain meaning, the evidence in the present case was sufficient to convict the defendant of sexual assault in a spousal relationship. There was evidence before the jury that the defendant picked up the victim against her will, carried her into the bedroom and had sexual intercourse with her even though she repeatedly indicated that she did not want to engage in such activity. There also was evidence before the jury of a pattern of threatening behavior by the defendant leading up to the act, including instances of physical abuse, that the jury could have found reasonably led the victim to fear physical injury. On the basis of that evidence, the jury could have found beyond a reasonable doubt that the defendant was guilty of sexual assault in a spousal relationship under § 53a-70b (b).

## II

The defendant next claims that the court erred by allowing the admission of certain uncharged misconduct evidence. Specifically, he takes issue with the admission of testimony by the victim relating to the various incidents leading up to the events for which the defendant was arrested. The substance of this testimony was described previously in this opinion. The defendant did not object to any of this testimony at trial, and he concedes that his claim on this point is

therefore unpreserved. He nevertheless maintains that the admission of this evidence is reviewable under *State v. Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as constitutional error and under the plain error doctrine. We disagree.

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. We consistently have held that purely evidentiary claims fail the second prong of *Golding* as they are not of constitutional magnitude. See *State v. Wells*, 111 Conn. App. 84, 90, 957 A.2d 557 ("[t]he defendant can not raise a constitutional claim by attaching a constitutional label to a purely evidentiary claim or by asserting merely that a strained connection exists between the evidentiary claim and a fundamental constitutional right" [internal quotation marks omitted]), cert. denied, 289 Conn. 958, 961 A.2d 423 (2008); see also *State v. Gardner*, 297 Conn. 58, 65, 1 A.3d 1 (2010) ("the erroneous introduction of prior misconduct evidence involves a claim arising under state law and does not involve any constitutional right" [internal quotation marks omitted]). The defendant's claim is purely evidentiary in nature, and it therefore fails under the second prong of *Golding*.

The defendant next asserts that his unpreserved claim should be reviewed under the plain error doctrine. See Practice Book § 60-5. We disagree. As our Supreme Court has explained: "The plain error doctrine is a rule of reversibility reserved for truly extraordinary situations where the existence of the error is so obvious

that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Roger B.*, 297 Conn. 607, 618, 999 A.2d 752 (2010).

The court did not commit plain error by admitting the victim's testimony regarding the defendant's uncharged misconduct. Section 4-5 (b) of the Connecticut Code of Evidence, laying out exceptions to the general prohibition on the admission of misconduct evidence in § 4-5 (a), provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." In its instructions to the jury, the court indicated that the jury was to consider the victim's uncharged misconduct testimony only for the issues of motive, the use of force or threatened use of force and corroboration.[4] After reviewing the record, we conclude that the victim's testimony was sufficiently germane to the purposes of

---

[4] The court's instructions pertaining to the uncharged misconduct testimony stated: "The state has offered evidence of other acts of misconduct of the defendant. This is not being admitted to prove the bad character of the defendant or that the defendant—or defendant's tendency to commit criminal acts. Such evidence is being admitted solely to show or establish: One, a motive for the commission of the crime alleged, i.e., jealousy; two, an element of the crime of spousal sexual assault, i.e., the use of force against the other spouse or threatened use of force, which reasonably causes

motive, the use of force or threatened use of force and corroboration. The testimony was relevant, material and probative of the purposes for which it was offered. The defendant has failed to demonstrate that the admission of this relevant evidence, to which he did not object, constituted an obvious error that affected the integrity of the trial. Therefore, the defendant's attempt to invoke the plain error doctrine in this case must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

the other spouse to fear physical injury; and three, to corroborate crucial prosecution testimony by completing the story.

"The evidence I am referring to includes the [victim's] testimony about the incidents on July 13, July 19 and July 28, in which she claims that the defendant either threatened or injured her with a knife. I'm also referring to the August 22 incident, in which the [victim] testified that the defendant beat her with a belt, and the September 14 incident, in which the [victim] claims that she was—that she injured her knee when the defendant chased her on a public street.

"You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issues for which it is being offered by the state. But only as it may bear on the issues of motive, the use or threatened use of force, and corroboration.

"On the other hand, if you do not believe such evidence or even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it is being offered by the state, namely, motive, the use or threatened use of force, and corroboration, then you may not consider that testimony for any purpose.

"You may not consider evidence of other misconduct of the defendant for any purpose other than the ones I've just told you, because it may predispose your mind uncritically to believe that the defendant may be guilty of the offence here charged, merely because of the alleged other misconduct. For this reason, you may consider this evidence only on the issues of motive, the use or threatened use of force and corroboration, and for no other purpose."