******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JUAN C.*
(AC 37552)

Keller, Prescott and West, Js.

*Argued September 21, 2016—officially released January 10, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Bentivegna, J.)

*Heather N. Wong*, certified legal intern, with whom
was *Glenn W. Falk*, assigned counsel, for the appel-
lant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with
whom, on the brief, were *Gail P. Hardy*, state's attor-
ney, and *Richard J. Rubino*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Juan C., appeals from the judgment of conviction, rendered after a jury trial, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (2),[1] and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1).[2] On appeal, the defendant claims that the trial court, *Bentivegna*, *J.*, improperly (1) refused to grant his request for a continuance of his trial, and (2) denied his motion for a judgment of acquittal as to the first count, sexual assault in the first degree. We affirm the trial court's judgment in part and reverse the judgment in part.

The jury reasonably could have found the following facts. The defendant is N's[3] biological father and, although N has always lived with her mother, she visited the defendant frequently between her birth in October, 1997, and 2005. During that time, both N and the defendant lived in New York. The defendant later moved to Hartford, and N did not see the defendant from 2005 until the summer of 2008, when he "popped back up" at the house of N's mother and asked to spend more time with N. N's mother agreed, and a few weeks later, in July, 2008, the defendant drove to New York to pick up N and brought her to his apartment in Hartford. N was ten years old at the time.[4]

At some point during the visit, while they were home alone, the defendant called N into his room to watch cartoons on television. The defendant was lying in his bed with only his boxer shorts on, and N was wearing a T-shirt, pajama pants, and underwear. N entered the bedroom, and the defendant asked her to lie on the bed with him, which she did. The defendant then asked N to move closer to him and lie on his chest, which she did. The defendant began rubbing N's back and buttocks over her clothing. He then put his hands under N's pajama pants and underwear and penetrated her vagina with his finger. While doing so, the defendant masturbated with his other hand. N then got off the bed and went back to her own room, sat on her bed, and watched television.

N called her mother at some point after the incident to tell her that she wanted to go home to New York, but did not disclose what had happened. The defendant claimed that he did not have enough money for gas to drive her home, so N stayed in Hartford for a few more days. After he brought her home, the defendant "disappeared" again, and N did not see him for another two years. N did not disclose to anyone that the July, 2008 incident had occurred until October, 2010, when she told her teacher and her mother. Subsequently, New York Child Protective Services (child protective ser-

vices), the Connecticut Department of Children and Families (department), and the Hartford Police Department became involved, and the defendant was arrested.

Before the start of the evidentiary portion of the trial, the defendant requested a continuance due to the fact that he had received a department report that morning that mentioned the child protective services investigation, and he wanted time to obtain more information about the New York investigation. The court denied his request and proceeded to trial. At trial, N, her mother, a Hartford police officer, and a licensed clinical social worker testified for the state. At the close of the state's evidence and again at the close of his own evidence, the defendant moved for a judgment of acquittal as to count one, charging sexual assault in the first degree. The court denied the defendant's motion.

On July 17, 2014, the jury found the defendant guilty on all three counts. The court sentenced the defendant on October 27, 2014, to the following: twenty-five years incarceration with a mandatory minimum of five years incarceration, execution suspended after twelve years, and fifteen years of probation for the first degree sexual assault conviction; twenty years incarceration with a mandatory minimum of five years incarceration, execution suspended after twelve years, and fifteen years of probation for the risk of injury to a child conviction under § 53-21 (a) (2);[5] and ten years incarceration, execution suspended after five years, and fifteen years of probation for the risk of injury to a child conviction under § 53-21 (a) (1). The court ordered all three sentences to run concurrently for a total effective sentence of twenty-five years incarceration, suspended after twelve years, and fifteen years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim on appeal is that the court erred in refusing to grant a continuance, which the defendant requested on the morning of trial to allow him to obtain newly discovered information about the child protective services investigation contained in the department protocol. Specifically, the defendant argues that the child protective services investigation records would likely contain material essential to his defense, which would cast doubt on the veracity of N's statements regarding the defendant's prior uncharged misconduct. The state argues that the court did not abuse its discretion in denying the defendant's request. We agree with the state.

The record reveals the following additional facts and procedural history relevant to this claim. In addition to the allegations that the defendant sexually assaulted N in Hartford in July, 2008, there are also uncharged misconduct allegations that the defendant sexually

assaulted N in New York in 2005. The court allowed the state to question N at trial about this uncharged conduct, and she testified that during a visit in New York with the defendant in 2005, while N was seven years old, the defendant sexually assaulted her by fondling her vagina to see if she had "wet [her]self." N did not disclose this incident until October, 2010, when she also told her mother about the July, 2008 Hartford incident.

There was evidence presented at trial that, shortly after N's disclosure, her mother contacted child protective services in New York, which then opened an investigation into the matter. In an interview with child protective services social worker Kelly Dickinson, N disclosed information about the 2008 Hartford incident only, and nothing about the 2005 New York incident.[6] Child protective services subsequently referred the case to the department because the only allegations were those arising from the Hartford incident.

Months before the beginning of trial, the defendant received from the state a department form, called Form 737 (form), which the department had sent to the Hartford Police Department to inform the police that the department was conducting an investigation into the July, 2008 Hartford incident.[7] The form states, inter alia, that "there is a companion investigation in the [s]tate of New York as a result of current allegations," and also that N's mother "reported [to the department] that [N] also reported that when [the defendant] was residing in New York he used to touch her as well." The form also included the name and telephone number of the child protective services social worker assigned to investigate the allegations. The defendant's counsel stated that the form was "original discovery [material] going back to pretrial" and that he had possessed this prior to the date of trial. There is no evidence that the defendant tried to contact the child protective services social worker or requested any records regarding that investigation.[8]

On the morning of the start of trial, the defendant received a copy of a the department's investigation protocol (protocol). The protocol contained case notes from a department social worker and included comments made by Dickinson, who had referred the case to the department. According to the case notes, Dickinson reported to the department that N "did not make any disclosures of any incidents taking place in the Orange County [New York] jurisdiction. [N] did not make any disclosures about anything happening in the Bronx area either; she did not want to talk about it. [Dickinson] reported that [N stated that] nothing happened in Orange [County], and that it happened in Connecticut, however, she was not clear. [Dickinson] reported that [N] stated that she was too young when she visited in the Bronx and she did not want to talk about it.

[Dickinson] reported that 'they,' meaning her and the police in New York, did not want to press her for [an] interview due to the fact that they did not know [how] many more people she would have to talk to."

Upon receiving the protocol, the defendant objected to proceeding with trial and requested a continuance in order to procure additional investigation materials from New York. The defendant's counsel stated: "There is an indication—it's a hearsay indication because it's the author's report about what he or she was told by what appeared to be state of New York authorities with [child protective services] who are investigating this claim because of [N] and her mother living in New York and that's where the disclosure was made. And that indicates that [N] did make some disclosure to the New York authorities about the incident that we're presently on trial for. . . . [I]n terms of the uncharged misconduct, [N] specifically declined to discuss that issue with the New York authorities. I do not know the reason for that. There's some suggestion by the [department social worker] being told that—something about [N] thought she was too young or didn't remember."[9]

Additionally, the defendant's counsel argued: "[M]aybe a more practical nuts and bolts view of this. [N] testifies. On cross, I ask her: Is it true that you went in and talked to child protective services on the date certain? And she says no or she says, I don't remember, I'm not in a position at the present time to follow that up. I know it seems to have happened, but I know essentially by hearsay. Any of the myriad of things that we have discussed that could be described as exculpatory, I'm in the same position. I'm not properly prepared at this time, having only received the report today, to properly represent [the defendant]." The state asked the court to proceed with trial.

In denying the defendant's requested continuance, the court noted, inter alia, that the case had been pending since June, 2011, and, in terms of the defendant's access to child protective services and department reports, that the state's attorney's office had an open file policy, and that the defendant did not file any discovery motions. The court also noted that, although there had been some difficulty communicating with child protective services, the department records, which were available to the defendant at least months before the start of trial, mentioned the investigation done by child protective services in New York.[10] Furthermore, the court noted that N was subject to cross-examination.

On appeal, the defendant argues that the court abused its discretion in denying his continuance request because the investigation records from child protective services likely contained material essential to his defense. The state argues that the court's denial of the defendant's continuance request was not an abuse of discretion. We agree with the state.

The standard of review and applicable law relevant to this claim are well settled. "The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . Every reasonable presumption will be made in favor of the trial court's proper exercise of discretion. . . . There is no mechanical test for determining whether the denial of a continuance constitutes an abuse of discretion. A reviewing court must consider the particular circumstances of each case, paying special attention to the reasons presented to the trial court at the time the request was denied." (Citations omitted; internal quotation marks omitted.) *State* v. *Hamilton*, 30 Conn. App. 68, 82–83, 618 A.2d 1372 (1993), aff'd, 228 Conn. 234, 636 A.2d 760 (1994).

A court has the discretion to consider many factors when considering a request for a continuance, including "the timeliness of the request for continuance; the likely length of the delay . . . the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; [and] the defendant's personal responsibility for the timing of the request . . . . [A]n appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 135 Conn. App. 385, 393–94, 42 A.3d 446, cert. denied, 305 Conn. 916, 46 A.3d 171 (2012).

After considering the relevant information before the trial court, we conclude that the court did not abuse its discretion when it denied the defendant's motion for a continuance.

First, the court properly considered the timeliness of the defendant's continuance request. This case had been pending for more than three years, and the defendant requested the continuance on the morning of trial, right before the court began hearing evidence. In considering the timeliness of the request, it is important to note that "[w]e are especially hesitant to find an abuse of discretion where the court has denied a motion for continuance made on the day of the trial." (Internal quotation marks omitted.) Id., 394.

Second, the court properly considered whether a continuance would have negatively impacted opposing counsel, the witnesses, and the court. The request was made just before N, who lived out of state, took the stand to testify. In addition to N, there were three other witnesses prepared to testify that day, including N's mother, who also lived out of state. Additionally, the

parties and the court had invested significant time in this three year old case, and the state's attorney, defendant's counsel, and the court had already spent three days prior to trial selecting the jury, who was prepared to begin hearing evidence that day.

Third, as to the legitimacy of the reasons proffered in support of the defendant's request, the defendant argued that the continuance was necessary in order to obtain additional information about the New York investigation that *could be* exculpatory, and that *may* cast doubt on the veracity of N's testimony at trial. The defendant was merely speculating that any additional information from this investigation would benefit his defense. We have held that it is proper for a court to deny a continuance request, sought in order to obtain discovery evidence, where the benefit of such evidence is speculative. See id., 395.

In addition, the court properly considered the defendant's personal responsibility for the timing of the request. The defendant's counsel argued that, without more time to obtain further information about the New York investigation, he would not be able to properly represent the defendant. The defendant, however, could have obtained further information well before the start of trial, eliminating any need for the requested continuance. The court noted that the defendant had access to the state's file through the open file policy of the state's attorney's office, and that the defendant could have filed discovery motions to obtain this information well before trial. Additionally, the defendant had in his possession months before trial the department form that referenced the New York investigation and that provided the name of and contact information for the child protective services social worker assigned to the investigation. Therefore, the defendant was on notice well in advance of trial that there had been a New York investigation, and he could have investigated further to procure any other information or documents to assist him in his defense.

Lastly, the defendant did not specify in his request how long of a continuance he was seeking. Therefore, the court had no indication as to the likely length of delay a continuance would cause. We have held that "[i]t is . . . within the trial court's discretion to deny a continuance when the length of the delay sought is unspecified." *State* v. *Godbolt*, 161 Conn. App. 367, 377, 127 A.3d 1139 (2015), cert. denied, 320 Conn. 931, 134 A.3d 621 (2016).

Accordingly, we conclude that the trial court did not abuse its discretion in refusing to grant the defendant's continuance request.

## II

The defendant's second claim is that the trial court improperly denied his motion for a judgment of acquit-

tal because the evidence was insufficient to support his conviction of sexual assault in the first degree as charged in the amended information.[11] Specifically, the defendant contends that the state presented no evidence that he used force to compel N to engage in sexual intercourse, and, therefore, the trial court erred in denying his motion for a judgment of acquittal. The state argues that the court properly denied the defendant's motion because the jury reasonably could have concluded that the defendant had used force to compel the sexual intercourse. We agree with the defendant, and, accordingly, reverse the defendant's conviction of sexual assault in the first degree.

We first set forth our standard of review and the applicable statutes relevant to this claim. "The due process clause of the fourteenth amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (Internal quotation marks omitted.) *State* v. *Johnson*, 165 Conn. App. 255, 288, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016). "A defendant who asserts an insufficiency of the evidence claim bears an arduous burden. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that support's the jury's verdict of guilty. . . . If, however, the evidence is insufficient to meet the burden of proof of guilt beyond a reasonable doubt, bearing in mind that the state has the burden of establishing by such proof every essential element of the crime charged, the verdict must be set aside." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 148 Conn. App. 684, 695, 86 A.3d 498 (2014), aff'd, 317 Conn. 338, 118 A.3d 49 (2015).

Section 53a-70 (a) (1) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ." General Statutes § 53a-65 (7) provides in relevant part: "Use of force means . . . (B) use of actual physical force or violence or superior physical strength against

the victim." (Internal quotation marks omitted.) We also note that "[p]enal statutes are to be construed strictly . . . and not extended by implication to create liability that the legislature did not purport to create. . . . Words and phrases, however, are to be understood according to the commonly approved usage of the language; General Statutes § 1-1 (a); and words used in a criminal statute should not be accorded the narrowest technical meaning in disregard of their context and in frustration of the obvious legislative intent. . . . We have previously acknowledged that the statutory definition of 'use of force' is clear and that 'it contains no words not commonly used which might not be understood in their ordinary meaning.' " (Citations omitted.) *State* v. *Hufford*, 205 Conn. 386, 392, 533 A.2d 866 (1987).

The record reveals the following additional facts and procedural history relevant to this claim. Count one of the original information, dated July 2, 2014, charged the defendant with sexual assault in the first degree in violation of § 53a-70 (a) (1) and alleged that "the defendant compelled another person to engage in sexual intercourse by the use of force against such other person *or by the threat of use of force against said person* which reasonably caused such person to fear physical injury." (Emphasis added.)

After the close of the state's case, the defendant moved for a judgment of acquittal on all three counts. Thereafter, the court asked the state if, in count one, it was still alleging that the defendant compelled the sexual intercourse by the use of force or by the threat of use of force, to which the state replied that it was pursuing only the use of force element.[12] The court denied the defendant's motion for a judgment of acquittal. Thereafter, on July 16, 2014, the state filed an amended information to reflect the change in count one,[13] which still charged the defendant with sexual assault in the first degree in violation of § 53a-70 (a) (1), but alleged: "[T]he defendant compelled another person to engage in sexual intercourse *by the use of force against such other person*." (Emphasis added.) The defendant rested without putting on any evidence and renewed his motion for judgment of acquittal as to count one only, sexual assault in the first degree. The court denied the defendant's motion. The jury found the defendant guilty on all three counts.

At trial, N's testimony was the only direct evidence regarding the alleged events that occurred during the Hartford incident in July, 2008. When questioned by the prosecutor, N testified as follows:

"Q. Now, in July of 2008, while you were visiting your father, the defendant in this case, what happened?

"A. One early morning, I woke up and the defendant was in his room and I woke up to use the bathroom. And he called me in his room to watch cartoons. . . .

"Q. So you walk into his bedroom, and what happens next?

"A. He asked to me to come lay down with him.

"Q. What do you do when he says that?

"A. I go and lay down with my father.

"Q. And then what happens?

"A. He attempts to turn on the TV. . . .

"Q. Was he successful?

"A. No. . . .

"Q. Then what happens?

"A. He asked me to move a little closer to him and lie on his chest.

"Q. What do you do?

"A. I move closer and lie on his chest.

"Q. Then what happens?

"A. He began to rub my back and then eventually— I'm sorry. And then eventually my butt, buttocks.

"Q. Now you said he was rubbing your back.

"A. Uh-huh.

"Q. He was rubbing your buttocks. Over the clothes or under the clothes?

"A. Over.

"Q. So over the clothes. Then what happens?

"A. He put his hand inside my pants.

"Q. Okay. Does he—so he puts your—his hands in your pants?

"A. Yes.

"Q. Okay. Are you wearing underwear?

"A. Yes.

"Q. All right. Is he touching skin?

"A. Yes.

"Q. Then what occurs?

"A. He used his finger to penetrate my vagina.

"Q. Okay. He had tried to turn the TV on. Did [he] put the remote control down at this point?

"A. Yes.

"Q. So he had both hands free?

"A. Yes.

"Q. Was he doing anything else at this time? . . .

"A. He had his hand in his boxer shorts and he was touching himself.

"Q. What do you mean touching himself? Touching himself where?

"A. He was touching his penis. . . .

"Q. Okay. What happens? You said he penetrated your vagina with his finger?

"A. Yes.

"Q. What happens next?

"A. I just—I moved away from him.

"Q. And you moved away from him. Were you still on the bed?

"A. No. I got up and walked away. . . .

"Q. . . . So you left the room?

"A. Yes.

"Q. And then where did you go?

"A. I went back to the room—the bedroom I was staying in down the hall.

"Q. And then what did you do?

"A. I just sat on my bed, well, the bed I was sleeping in, and turned on the TV."

On the basis of this testimony, the defendant appeals from the denial of his motion for judgment of acquittal as to count one, sexual assault in the first degree. The state was required to prove beyond a reasonable doubt that the defendant used force to compel N to engage in the sexual intercourse. The defendant argues that the state did not meet its burden. We agree.

Our Supreme Court has held that "use of force," as defined by § 53a-65 (7), does not extend to "mere touching." *State* v. *Hufford*, supra, 205 Conn. 393. In *Hufford*, the defendant, a paramedic, was convicted of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A),[14] on the basis of allegations that he opened the victim's blouse and unzipped her pants to fondle her breasts and massage her vagina with his fingers while she was legally rendered immobile and being transported to the hospital. Id., 390. The defendant challenged his conviction and argued that "the state presented no evidence that [he] used force to compel the alleged sexual contact." Id., 391. In determining that the defendant's actions did not constitute force, the court stated that there was only "mere touching" and further stated that "[n]either violence, nor physical coercion, nor use of superior strength was necessary to assault this complainant sexually," and that "[t]he evidence adduced at the trial of this case demonstrated that the defendant had no need to exert force to effect the sexual contact." Id., 393.

The state argues that *Hufford* was limited to its unique facts by *State* v. *Mahon*, 97 Conn. App. 503, 905

A.2d 678, cert. denied, 280 Conn. 930, 909 A.2d 958 (2006), and, therefore, is inapplicable to the present case. This court, in *Mahon*, stated: "*Hufford* did not create a per se rule that the act of removing a victim's clothing to engage in sexual intercourse always is insufficient evidence of force. Rather, *Hufford* simply stands for the proposition that if a complainant is already under medical restraint, the act of unzipping her pants and opening her blouse requires no force." Id., 511. Although we agree with the state that the factual scenario in the present case is distinguishable from that in *Hufford*, the court's holding in *Hufford* still controls: mere touching, in the absence of violence,[15] physical coercion, or use of superior physical strength, is insufficient to prove that the defendant used force to compel the sexual intercourse.

In the present case, like in *Hufford*, the defendant had no need to exert force to compel the sexual intercourse. N testified that she complied with the defendant's requests that she come into his room, lie on the bed, move closer to him, and lie on his chest. She testified further that she stopped the intercourse by moving away from him, getting off the bed, and leaving the room. There was no testimony that the defendant exerted force to make her come into his room and lie on the bed with him, or to try to keep her on the bed. It was not necessary, therefore, that the defendant use physical coercion or his superior physical strength in order to sexually assault N. We do not highlight these facts to focus on the adequacy of N's resistance, as we recognize that is not the focus in a sexual assault case. See *State* v. *Kulmac*, 230 Conn. 43, 75, 644 A.2d 887 (1994). This evidence, however, illustrates the defendant's lack of need to exert force in order to compel the sexual intercourse.

The state further argues that our decision in *State* v. *Mahon*, supra, 97 Conn. App. 503, controls the outcome of the present case. We disagree. The defendant in *Mahon* was convicted of sexual assault in the first degree, sexual assault in the first degree as an accessory, and conspiracy to commit sexual assault in the first degree. Id., 508. In that case, the defendant and another man, Oraine Duncan, drove the victim to a field and sexually assaulted her while she was in the back seat of a two door car. Id., 506–507. The victim in *Mahon* protested and told the defendants that she " 'didn't want to do this because she was saving [herself] for [her] boyfriend.' " Id., 507. While Duncan was in the back seat with the victim, he tried unsuccessfully to pull down the victim's underwear. Id., 507. The defendant reached into the back seat and pulled down the victim's underwear past her knees, allowing Duncan to have vaginal sexual intercourse with the victim. Id. The defendant then also had vaginal sexual intercourse with the victim. Id. The defendant appealed from the court's denial of his motion for a judgment of acquittal, and

argued, inter alia, that there was no evidence that he used force, or threatened to use force, to compel the victim to engage in sexual intercourse. Id., 509.

In affirming his convictions, the court in *Mahon* opined: "[T]he jury reasonably could have concluded that the defendant's act of removing her underpants, *to assist his companion in sexually assaulting her*, constituted force. Thus, *as this claim relates to the defendant's conviction of conspiracy to commit sexual assault in the first degree and sexual assault in the first degree as an accessory*, the jury reasonably could have found that his forcible removal of [the victim's] underpants while she was under assault from Duncan met the force requirement of the statute." (Emphasis added.) Id., 511–12. In contrast, though, the court further opined: "The jury also reasonably could have inferred that the defendant's act of forcibly removing [the victim's] underpants, to assist Duncan in sexually assaulting [her], *constituted an implied threat that he would use force to compel her to engage in sexual intercourse with him* and that such implied threat was intended to and did in fact compel [the victim] to submit to sexual intercourse with the defendant." (Emphasis added.) Id., 513–14. This distinction by the court between when the defendant's act of pulling down the victim's underwear constituted actual force and when it constituted the threat of force is instructive of our analysis in the present case.

The state argues in the present case that, under *Mahon*, "the jury reasonably could have concluded that the defendant used his superior strength to move the complainant's underwear to allow the compelled intercourse to occur." We find the state's reliance on *Mahon* to be misplaced for two reasons.

First, the action contemplated in *Mahon* was the defendant's *forcible removal* of the victim's underpants. There is no evidence in the present case that the defendant forcibly removed N's underwear. N testified that the defendant "put his hand inside [her] pants" and then "used his finger to penetrate [her] vagina." The state is asking us to extend the holding in *Mahon* to mean that any incidental underwear movement that may have occurred when the defendant put his hand inside N's underwear constitutes force. In our view, however, there is a significant difference between forcibly removing a victim's underwear and the incidental underwear movement that is required to commit the penetration of the victim's vagina. Therefore, we decline to extend *Mahon* to include the facts of this case.

Second, our decision in *Mahon* distinguished between when the defendant's forcible removal of the victim's underwear constituted actual use of force and when it constituted a threat to use force. See id., 511–14. Under *Mahon*, a defendant's action of forcibly removing the victim's underwear can be used to prove that the

defendant used actual force to compel the sexual intercourse, for purposes of a charge of sexual assault in the first degree as an accessory or as a conspirator. Id., 511–12. The same action by a defendant, though, can be used to prove that the defendant threatened to use force to compel the sexual intercourse, for purposes of a charge of sexual assault in the first degree as a principal. Id., 513–14. The defendant in the present case was charged with sexual assault in the first degree as a principal. Therefore, even if we were to extend the holding in *Mahon* to include the facts of this case, any incidental underwear movement required in order for the defendant to penetrate the victim's vagina could only be used to show that the defendant *threatened* to use force against N to compel the sexual intercourse. The state explicitly declined to charge the defendant as such. For these reasons, we do not agree with the state that *Mahon* controls our analysis here.

The state further relies on *State* v. *Ferdinand R.*, 132 Conn. App. 594, 33 A.3d 793 (2011), aff'd, 310 Conn. 686, 82 A.3d 599 (2013), for the proposition that the "use of force" element of § 53a-70 (a) can be satisfied by demonstrating those acts that are necessary to accomplish the sexual assault, and nothing further. We disagree with the state's interpretation of *Ferdinand R.*

The defendant in *Ferdinand R.* was convicted of sexual assault in a spousal relationship in violation of General Statutes § 53a-70b (b).[16] Id., 595. In arguing that the evidence was insufficient to sustain his conviction, the defendant encouraged the court to "interpret the statute to require proof beyond a reasonable doubt that he . . . used force greater than necessary to separate the victim's legs . . . ." Id., 599–600. In declining to do so, this court opined: "There is no qualifying language that says that the force must be greater than is necessary to separate the victim's legs." Id., 602. We do not read this statement, as the state appears to, as creating a per se rule that force used to separate the victim's legs is enough to satisfy the "use of force" element. The court merely refused to find that the plain language of the statute necessitated such an interpretation. Id., 601–602. In fact, the court itself seemingly did not interpret its own statement as a per se rule that the force necessary to separate the victim's legs was sufficient to prove "use of force." In affirming the defendant's conviction, the court considered the totality of the force used by the defendant, not just that which was used to separate the victim's legs. Id., 605 ("[t]here was evidence before the jury that the defendant picked up the victim against her will, carried her into the bedroom and had sexual intercourse with her even though she repeatedly indicated that she did not want to engage in such activity").

Our interpretation of *Ferdinand R.* aligns with earlier jurisprudence on this question. Our Supreme Court, in

*State* v. *Petitpas*, 299 Conn. 99, 6 A.3d 1159 (2010), considered similar actions by a defendant convicted of sexual assault in the first degree. The jury in *Petitpas* had before it evidence that the defendant spread the victim's legs apart in order to engage in oral sex on the victim and continued to pull her legs open when she tried to close them before lying on top of the victim and engaging in vaginal intercourse with her. Id., 105–106. In affirming the conviction, the court opined: "[T]he jury reasonably could have concluded *that the cumulative force of the evidence* established guilt beyond a reasonable doubt . . . ."[17] (Emphasis added; internal quotation marks omitted.) Id., 106.

In the present case, the jury had no evidence before it that the defendant used any force whatsoever to separate N's legs in order to effectuate the sexual intercourse. Additionally, even if we were to infer that the defendant did use the minimum force necessary to separate N's legs, under our interpretation of *Ferdinand R.* and *Petitpas*, there was no additional or cumulative use of force sufficient to bring the facts of the present case within those holdings. Unlike *Ferdinand R.* and *Petitpas*, there is no evidence that the defendant here engaged in other forceful behavior, such as picking the victim up and carrying her, pulling the victim's legs open when she tried to shut them, or lying on top of her, in order to compel the sexual intercourse. In fact, N testified that the defendant only ever used one hand to touch her, and the other he used to masturbate. Therefore, we do not agree with the state that *Ferdinand R.* controls our analysis here.

The state further argues that, on the basis of our Supreme Court's ruling in *State* v. *DePastino*, 228 Conn. 552, 638 A.2d 578 (1994), "the jury reasonably could have concluded that the child complainant did not want to participate in the sexual intercourse imposed on her by her physically stronger father, and that the defendant used his superior strength to compel her to engage in sexual intercourse." We do not agree. The defendant in *DePastino* was convicted of sexual assault in the first degree on the basis of allegations that he inserted his penis into his eighteen month old daughter's vagina. *State* v. *DePastino*, supra, 569–70. In finding that the defendant's actions constituted use of superior physical strength, and, therefore, use of force, the court stated: "Considering the relative size difference between the defendant and his eighteen month old daughter, the injuries to her vaginal area, the fact that she was crying during the assault and the testimony of the physician that the assault would have been very painful to the child, the jury from the evidence reasonably could have concluded beyond a reasonable doubt that the defendant compelled the younger child to engage in sexual intercourse by using superior physical strength." Id., 571.

In the present case, unlike in *DePastino*, the jury had before it no evidence that N suffered any injuries to her vaginal area or that she was crying or experienced pain during the assault, and there was no testimony from a medical expert that the digital penetration that occurred here would have been painful for N. Therefore, we do not agree that the court's decision in *DePastino* necessitates a finding here that the defendant used superior physical strength against N.

Lastly, the state argues that the defendant's use of force to compel the sexual intercourse can be proven by the fact that the defendant, an adult male, was stronger than N, a ten year old girl, and that N was afraid of him.[18] We do not agree. In *State* v. *Mahon*, supra, 97 Conn. App. 512, this court stated: "[W]e have consistently held that one also may be guilty of sexual assault in the first degree if one uses one's physical size or strength *to threaten another to submit to sexual intercourse* . . . ."[19] (Emphasis added.) In *Mahon*, the victim testified that "she was afraid to resist the defendant's . . . sexual advances because she knew that her resistance . . . would be futile." Id., 513. This court held, in affirming the defendant's conviction, that the defendant's actions that led to the victim's fear of resisting his advances constituted an *implied threat to use force.* Id. The court did not go so far as to say that the victim's fear of the defendant constituted the use of actual force against the victim. Therefore, N's testimony at trial that she was afraid of the defendant could have been used to prove only that the defendant *threatened* to use force against her in order to compel her to engage in sexual intercourse. The state, however, explicitly declined to charge the defendant in this manner.

A review of additional jurisprudence on this question supports our conclusion that the defendant's actions did not constitute use of actual force to compel N to engage in sexual intercourse. In *State* v. *Gagnon*, 18 Conn. App. 694, 699, 561 A.2d 129, cert. denied, 213 Conn. 805, 567 A.2d 835 (1989), we concluded that the evidence admitted below was sufficient for the jury to reasonably conclude that the defendant used physical coercion, and, therefore, actual force, for purposes of a conviction of sexual assault in the third degree.[20] In *Gagnon*, the defendant impersonated a police officer to pull over the victim's car, and, while she was pulled over on the side of the road, the defendant reached inside of her car and fondled her breasts. Id., 696. This court reasoned that it was significant that the defendant had illegally rendered the victim immobile, unlike in *Hufford*, and concluded that "the defendant's conduct constituted physical coercion. By using a subterfuge of being a police officer, the defendant caused the victim to stop her vehicle. Such coercion was intended to and did in fact place the victim in a position wherein she

was compelled to submit to sexual contact by the defendant." Id., 699.

In the present case, unlike in *Gagnon*, the jury had before it no evidence that the defendant used impersonation or subterfuge, or that he illegally rendered N immobile, in order to compel N to engage in sexual intercourse. Therefore, the facts of the present case were insufficient to establish beyond a reasonable doubt that the defendant used physical coercion, and therefore actual force, to compel N to engage in sexual intercourse.

On the basis of this review, we decline to extend the ordinary meaning of "use of force" to fit this particular case. It was the state's burden to prove, beyond a reasonable doubt, every element of sexual assault in the first degree as charged in the amended information, including that the defendant used actual force in compelling N to engage in sexual intercourse. Even when viewed in the light most favorable to the state, the record discloses no evidence upon which the jury could reasonably have concluded as such. Accordingly, we hold that the state's evidence was insufficient to convict the defendant of sexual assault in the first degree in violation of § 53a-71 (a) (1), and, therefore, the trial court improperly denied the defendant's motion for a judgment of acquittal.

The judgment is reversed with respect to the defendant's conviction of sexual assault in the first degree and the case is remanded to the trial court with direction to render judgment of acquittal on that charge only and to resentence the defendant on the remaining charges. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] General Statutes § 53-21 (a) (2) provides in relevant part: "Any person who . . . has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of [risk of injury to, or impairing the morals of, a child] . . . ."

[2] General Statutes § 53-21 (a) (1) provides in relevant part: "Any person who . . . wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health and morals of any such child . . . shall be guilty of [risk of injury to, or impairing the morals of, a child] . . . ."

[3] In accordance with General Statutes § 54-86e, the minor victim in this case will be referred to as N.

[4] Because N was ten years old at the time of the alleged offense, the state could have, but chose not to, charge the defendant with a violation of § 53a-70 (a) (2), which provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[5] Due to N's age at the time of the offense, the defendant's sentence for count two was enhanced pursuant to § 53-21 (a) (2) (B).

[6] N testified at trial that she did not disclose the 2005 New York incident in the interview with the child protective services social worker because she "wasn't ready to talk about it and the lady that interviewed [N] in New York didn't make [her] feel comfortable about talking about it." On cross-examination, she also testified that she did not disclose the New York incident to the interviewer because "the Hartford incident was the one [N] remembered the most."

[7] It is not clear from the record the precise date that the defendant received this discovery. The defendant, however, does not dispute that his counsel received the form long before trial, and agreed with the characterization of the period as "months and months" at oral argument before this court.

[8] Rather, the defendant argues the state should have conducted a further investigation by contacting child protective services.

[9] In addition to this argument, the defendant's attorney argued that there may be possible exculpatory material alluded to in the form or the protocol. See *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d. 215 (1963). Because the defendant did not raise this argument in his brief and specifically stated at oral argument before this court that he was not pursuing a *Brady* claim, we do not discuss this argument here.

[10] We also note that the defendant could have accessed the department records at any time as the parent under investigation. See General Statutes § 17a-28 (g) (1).

[11] The defendant does not challenge the sufficiency of the evidence for either of his two convictions for risk of injury to a child.

[12] The entire colloquy is as follows:

"The Court: All right. In terms of count one, the sexual assault in the first degree, is the state still pursuing the alternative by the threat or use of force, or is it one or the other? And this also has to go with the—in terms of the jury instructions that I'm going to need to prepare.

"[The Prosecutor]: Am I pursuing both?

"The Court: So I guess, basically, is the state's—right now, the information alleges that the—was by the use of force against such other person or by the threat of—

"[The Prosecutor]: The state will, based on the testimony, we'll just go with use of force.

"The Court: All right. So that's the—so it's basically in terms of the sex assault in the first degree, the state's alleging that the defendant compelled another person to engage in sexual intercourse by the threat or the use?

"[The Prosecutor]: By the use.

"The Court: Okay. So the defendant compelled another person to engage in sexual intercourse by the use of force against such other person, and the court—the state's not pursuing the threat of use of force allegation. Correct?

"[The Prosecutor]: Correct."

[13] Counts two and three did not change from the original information.

[14] Because " 'use of force,' " as defined by § 53a-65 (7) (B), is an element of both §§ 53a-70 (a) (1) and 53a-72a (a) (1) (A), the court's analysis in *Hufford* is instructive here.

[15] The parties agree that the facts of the present case do not support a finding that the defendant used violence in order to compel N to engage in sexual intercourse. The state argues only that "the jury reasonably could have concluded that the defendant used his *superior physical strength or actual physical force* to compel [N] to engage in sexual intercourse."

[16] Because " 'use of force,' " as defined by § 53a-65 (7) (B), is an element of both §§ 53a-70 (a) (1) and 53a-70b (b), this court's analysis in *Ferdinand R.* is instructive here.

[17] This court in *State* v. *Ferdinand R.*, supra, 132 Conn. App. 603, cited to *Petitpas* and stated in an explanatory parenthetical "defendant guilty of sexual assault in first degree even though force used was no greater than necessary to separate victim's legs." We question the court's characterization of the holding in *Petitpas* as it appears that the jury reasonably could have considered more than just the defendant's use of force to separate the victim's legs in convicting him of sexual assault in the first degree. *State* v. *Petitpas*, supra, 299 Conn. 106.

[18] N testified at trial that she saw the defendant "in rages in incidents when he didn't like what was going on, so he became violent." When questioned further on cross-examination, however, she could not remember a time when she saw him in a "violent rage."

[19] It is worth noting, however, that in each of the cases that the court cited in support of this proposition, the defendant was charged with compelling a victim to engage in sexual assault by the use of force *or by the threat of*

*use of force.* See *State* v. *Kulmac*, supra, 230 Conn. 75; *State* v. *Davis*, 61 Conn. App. 621, 639, 767 A.2d 137, cert. denied, 255 Conn. 951, 770 A.2d 31 (2001). As previously noted, the state, in the present case, declined to pursue charging the defendant with "threat of use of force."

This court in *Mahon* also cited to *State* v. *Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994). In *Chapman*, the information alleged only that the defendant compelled the victim to engage in sexual intercourse by the use of force. Id., 537. The court, however, instructed the jury that it could convict the defendant of sexual assault in the first degree if it found that he compelled the sexual intercourse by the use of force *or the threat of use of force.* Id. Our Supreme Court held that that was improper. Id.

[20] The defendant in *Gagnon* was charged under § 53a-72a (a) (1) (A). *State* v. *Gagnon*, supra, 18 Conn. App. 695. See footnote 14 of this opinion.

--------------------------------